# SUPREME COURT

OF THE

## STATE OF MISSOURI

OCTOBER TERM, 1903.

---

(*Continued from Volume 179.*)

---

## TANNER et al., Appellants, v. LINDELL RAILWAY COMPANY et al.

### In Banc, February 24, 1904.

1. **CORPORATION: Disposition of All Properties: Rule.** The rule that the directors of a corporation can not make final and complete disposition of all its properties without the unanimous consent of all its stockholders, is not an unqualified rule of law. The majority in interest have the right to rule within reasonable bounds. They can not arbitrarily or oppressively close out a corporation for their own advantage, but they are not compelled to continue an unprofitable business, or to pay the minority more than their stock is worth for the privilege of closing out.

2. ———: ———: **Rescinding Sale: Laches: Injuries.** The court will not decree the rescission of a sale of the properties of a corporation, made without the consent of all its stockholders, which has already gone into effect, if (1) such rescission would be productive of more injury than would result from a refusal of it, or (2) if the party asking for it has by his own laches waited until the rights of strangers who are not parties to the suit, and of the public generally, have grown out of it.

(1)

3. ———: ———: ———: **Doing Good Business.** The sale of all the properties of a corporation is not void and will not be set aside at the suit of a stockholder merely because the company was doing a fairly good business and some of the stockholders did not consent to the sale.

4. ———: ———: ———: **Rights Adjusted: Consolidation of Companies.** When a majority of the stockholders, against the will of the minority, sell all the property of the corporation and thereby work a practical dissolution of it, the minority are not bound to take in payment for their stock a pro rata share of the proceeds of the sale, or, in lieu thereof, the stock of another corporation, but, at their election, they may have the one or the other, or, if the transaction be made in bad faith, they may, under some circumstances, have the sale set aside.

5. ———: ———: ———: **As Affected by Interest of Petitioners.** When a court of equity undertakes to adjust the rights of the parties in a suit by the minority stockholders to have set aside a sale of all the properties to another corporation, the proportion of stock held by them respectively is a fact to be taken into consideration in selecting the remedy to be afforded the plaintiffs.

6. ———: ———: ———: ———: **Declining to Reveal Shares Held.** If the plaintiffs in such suit decline to say how many shares they hold, and take before the court the position that the relief they ask is as applicable to the holder of one share as it is to the holder of any number of shares less than a majority, they invite a judgment of their case as on a holding of one share.

7. ———: ———: **Rescinding Sale: Other Adequate Remedy.** If it is not necessary in order to redress the wrongs of the minority stockholders, who have not consented to the sale of all the properties of a corporation to other companies, on the faith of which many innocent persons have invested in the stock of the consolidated company, the sale will not be set aside, and the old corporation rehabilitated. If they may by a suit at law for damages have a complete remedy, the powers of an equity court will not be set in motion to work a rescission of the sale.

8. **PRACTICE: Equity: Demurrer: Relief.** In an action in equity, a demurrer to the petition should not be sustained if plaintiff is entitled to any relief whatever on the case stated in the petition. But the court can not, out of the materials at hand, construct a case for plaintiff different from that made in his petition, for the purpose of affording him some relief which he does not ask for.

9. ———: ———: ———: ———: **Case Stated: Corporation: Sale of Properties: Rescission.** In a suit by minority stockholders to rescind the sale of all the properties of a corporation and rehabilitate the company, the court can not give them a money judgment, as in an action at law, on the theory that they have ratified the contract of sale, for by their petition they repudiate the sale. Nor can they, while repudiating the sale and refusing to receive stock in the company to which the property of their company was sold, receive stock of that company in exchange. Nor is there any foundation in such a petition upon which the court could build a decree admitting them to a participation in the earnings of the new company. The petition in such case entitles them to a rescission of the sale, or it entitles them to nothing.

10. **CONSOLIDATION OF STREET RAILWAYS: Validity of Statute.** The validity of the statute of 1899 conferring on two-thirds of the stockholders of the interested companies owning the street railways of St. Louis power to sell the properties of those companies to a consolidated company, is not decided in this suit, because not necessary to a proper disposition of the case.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher*, Judge.

AFFIRMED.

*Hamilton & Grover* for appellants.

(1) It is beyond the power of a prosperous business corporation to convey away all of its assets without the consent of all the stockholders. Such action is a violation of the terms of the agreement between the stockholders themselves and the stockholders and the company, that the corporate property should be devoted to carrying on the corporate business. These agreements are entirely distinct from the contract between the State and the corporation, upheld in the Dartmouth College case. Cook on Corporations (4 Ed.), arts. 492, 670; Feld v. Roanoke Investment Co., 123 Mo. 613; Buford v. Packet Co., 3 Mo. App. 159; Abbott v. Rubber Co., 33 Barb. 589; Zabriskie v. Railroad, 18 N. J. Eq. 178; Mason v. Mining Co., 133 U. S. 50, 33 L. Ed. 524.

(2) The Lindell Railway Company never acquired any power to convey away all its assets under the act of June 19, 1899, for the reason that it never accepted that act in any manner whatsoever, much less in the exclusive manner specifically provided in said act itself.  (a) The method pointed out in that act by which .corporations then in existence could avail themselves of the provisions thereof, are exclusive of all other methods, and in order to show its authority to act, under the provisions thereof, the company must show that it has complied with the exclusive method set out in said act, signifying its acceptance thereof.  (b)  The powers conferred by that act were limited to two classes of corporations: First, those which were formed thereunder; and, second, those which accepted the provisions of that act, in the exclusive method specified therein.  The Lindell Railway Company can not be included in either one of these classes.  R. S. 1899, sec. 1188; Waterman on Corporations, 131; Mansfield v. Boryn, 26 Ohio St. 223; Railroad v. Macon County, 36 Mo. 294; State ex rel. v. Clemens, 43 Mo. 395.  (3)  Even if the United Railways Company had accepted the act of June 19, 1899, and had thus acquired the power to buy, nevertheless, the Lindell Railway Company never having accepted the provision of that act, had no power to sell.  To make a valid sale, both corporations must be legally authorized. Thompson on Corporations, art. 5980; Railroad v. Railroad, 145 U. S. 339, 16 L. Ed. 748; Railroad v. Railroad, 118 U. S. 290, 30 L. Ed. 83; Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24, 35 L. Ed. 55; Thomas v. Railroad, 101 U. S. 71, 25 L. Ed. 950; Railroad v. Railroad, 130 U. S. 1, 32 L. Ed. 837; Railroad v. Kentucky, 161 U. S. 678, 40 L. Ed. 849; Morrill v. Smith County, 89 Tex. 529; Railroad v. Rushing, 69 Tex. 306. (4)  Legislative power given generally to one company to buy other companies, does not give rise to any implied power on the part of such other companies to sell, even where both companies are incorporated under the

laws of the same State. The doctrine laid down above that both companies must be authorized, still holds, even where both companies are incorporated under the laws of the same State. Railroad v. Kentucky, supra; Morrill v. Smith County, supra; Railroad v. Rushing, supra; Morawetz on Corporations, art. 940; Pearsall v. Railroad, 161 U. S. 647, 40 L. Ed. 838. (5) The act of June 19, 1899, in so far as antecedent corporations are concerned is simply intended as a statutory permission to such corporations as have power to avail themselves of its terms. The State merely consents that the powers conferred by that act may be acquired by the company, provided it can be legally done without impairing the vested rights of its stockholders, and waiving any objections the State might have to such a procedure. It was not intended by that act to give to the majority of the stockholders any more power to deprive the minority stockholders of their vested contract rights, than they had before the act was passed. Railroad v. Marsh, 17 Wis. 13; Mowry v. Railroad, 17 Fed. Cases 930, 4 Bissell 78; Clearwater v. Meredith, 1 Wal. 25, 17 L. Ed. 604; Zabriskie v. Railroad, supra; Knoxville v. Railroad, 22 Fed. 762; Mills v. Railroad, 41 N. J. Eq. 1. (6) If this court should construe the act of June 19, 1899, as conferring upon the Lindell Railway Company the legislative power to convey away all of its property, without the consent of all its stockholders, such construction would render said act unconstitutional as far as dissenting stockholders of said company are concerned, as it would impair the obligation of the contract between the stockholders and the corporation, that the corporation assets should be devoted to the corporation business. Such an act could be accepted only by unanimous vote of all the stockholders. Cook on Corporations (4 Ed.), 500, 669; Clearwater v. Meredith, supra; Black v. Raritan Canal Co., 24 N. J. Eq. 455; Brown v. Fairmont Co., 10 Phila. 32; State ex rel. v. Adams, 44 Mo. 570; Fisher v. Patton, 134 Mo. 52; Rail-

road v. Harris, 27 Miss. 517; Proprietors of the Union Locks & Canal v. Towne, 1 N. H. 44; Morawetz on Corporations (2 Ed.), art. 645. Retrospective legislation is prohibited in Missouri. Sec. 15, Bill of Rights. (7) This would be so even if it is conceded that the State had the reserved power to alter, amend or repeal the charter of the Lindell Railway Company. This reserved power can not be so exercised as to impair the vested contract rights of the stockholders that the corporation assets should be devoted to carrying on corporation business. (a) Amendments of this radical character, which would deprive stockholders of this right, could only be accepted by the consent of all the stockholders. (b) A radical amendment to a corporation charter affecting stockholders' contract rights, will never be held to have been accepted by him, simply because the State confers upon him the power so to do; nor can such an amendment be accepted by the board of directors, nor by a majority of the stockholders, but only by the acquiescence or consent of all the stockholders. Cook on Corporations (4 Ed.), art. 501; Morawetz on Corporations (2 Ed.), art. 1096; Thompson, Commentaries on Corp., art. 91; Thompson on Corporations, art. 5413; Greenwood v. Railroad, 105 U. S. 13, 26 L. Ed. 962; Zabriskie v. Railroad, supra; Shields v. Ohio, 95 U. S. 325; Close v. Glenwood Cemetery Co., 107 U. S. 476; Orr v. Bracken, 81 Ky. 592; Railroad v. Collins, 40 Ga. 617; St. Louis v. Russell, 9 Mo. 503; Railroad v. Renshaw, 18 Mo. 210; Mowry v. Railroad, supra; Mills v. Railroad, 41 N. J. Eq. 1; Hill v. Railroad, 46 Fed. 610; Railroad v. Marsh, 17 Wis. 13; Pierce on Railroads, 98; Canal & Irrigation Co. v. Stanislaus County, 113 Fed. 930. (8) The right of a stockholder to have the corporation property of a going concern devoted to carrying on corporate business, is a vested right based upon his contract with the company, and one of the most radical of all possible violations of that contract would be a legislative grant of power to the majority of the stockholders

to convey away all the property of the company, without his consent. Black v. Canal Co., 24 N. J. Eq. 455; Railroad v. Railroad, 130 U. S. 1; Knoxville v. Railroad, 22 Fed. 762; Zabriskie v. Railroad, supra. (9) At the time when the act of June 19, 1899, was passed, there was no reserved power on the part of the State of Missouri to alter, amend, or repeal, the charter of the Lindell Railway Company, or of corporations in general. (a) Although the power to alter, amend or repeal may have been reserved by the State, at the time the charter was granted to the Lindell Railway Company, nevertheless at the time the Legislature passed the act of June 19, 1899, there was no law or provision in force in this State, giving the Legislature the right to alter, amend or repeal the charter of corporations. If any such reserved power existed at the time the Lindell Railway Company was incorporated, the law reserving that power was repealed, before the attempt by the State to pass the act of June 19, 1899, and if any such power existed on the part of the State, at the time of the incorporation of the Lindell Railway Company, such reserved power was surrendered by the State, by the repeal of the act reserving the same. Railroad v. Renshaw, 18 Mo. 210; New Jersey v. Yard, 95 U. S. 104; Thompson on Corporations, art. 5408, p. 29.

*Boyle, Priest & Lehmann* and *George W. Easley* for respondents.

(1) It not being alleged that the United Railways Company did not comply with the act of 1899, it must be assumed that it complied therewith. It not being alleged that the Municipal Assembly did not consent to the transfer of the Lindell Railway to the United Railways, such consent must be assumed. This being the state of the pleadings, the United Railways had full power to purchase the Lindell Railway, even though the Lindell Railway had not accepted the provisions of the

act of 1899. That statute gives the right to purchase "other street railways." R. S. 1899, p. 393, sec. 1187, par. 7. The right to purchase "other street railways" is not confined to such "other street railways" as have complied with the act of 1899. To sustain the contention of the plaintiffs, the court would be required to import into paragraph 7, of section 1187, the words, "which have accepted this act," after "other street railways." This would be legislation, not construction. (2) The simple question is, whether authority to the United Railways company to buy does not confer power upon the Lindell Railway Company to sell. This question has been expressly decided in other States. Matter of Railroad, 67 N. Y. 377; Knoxville v. Railroad, 22 Fed. 763; 3 Cook on Corp. (4 Ed.), sec. 894; Railroad v. Railroad, 52 Conn. 276. (3) The petition is deficient in facts, in that it does not allege a want of compliance with the Revised Statutes of 1899, section 1187, as to the manner of the sale of said property. It can not be contended that that act, or any act of the Legislature or of the corporate authorities of the city of St. Louis, impaired the obligation of any contract existing between the plaintiffs and the Lindell Railway Company. The legislative charter of the Lindell Railway Company expressly provided that "the part thereof within the limits of the city of St. Louis shall be subject to the ordinances, rules and regulations ordained or established by said city for the government and control of other street railways." Laws 1864, p. 486, sec. 2. The charter of the city of St. Louis, passed by the same Legislature, gave the city full control over street railways in the city, even after their completion. Laws 1863-4, 446. The Constitution of 1875, and the charter adopted by St. Louis thereunder, gave the city "sole power and authority" to amend the franchises of street railways. R. S. 1899, 2099, art. 3, sec. 26, par. 11. It would seem evident from these provisions that the power to amend and the control of the city has existed over the Lindell Rail-

way from the very time of its original incorporation. If the Lindell Company could acquire from the city and State the right to acquire and own other lines, it would seem that the same powers might be granted to the Central Traction Company, now the United Railways Company, and as the shareholders of the Lindell have agreed in the original charter to be bound by and subject to the ordinances of the city for regulation and government of other street railways, it is bound by whatever powers have been given to the Central Traction Company, now the United Railways Company. State ex inf. v. Railroad, 151 Mo. 162. When such power of amendment is reserved, shareholders are bound by subsequent changes. 1 Thompson on Corp., sec. 67; Railroad v. Renshaw, 18 Mo. 210; Railroad v. Hughes, 22 Mo. 291. Such power, if not police power, is in the nature of police power, and the courts never hold that power to be surrendered. If the Legislature concluded that "the general well-being of the State" required the consolidation or amalgamation of the street car lines of a city into one company, by sale or lease, and adopted means to accomplish such public policy, at the same time properly safeguarding private property interests, it had the power so to do. Const., art. 12, sec. 5. In either view of the case, the legislation authorizing the sale of the property of one street railway to another was entirely proper. R. S. 1899, sec. 1187. (4) The allegation of the petition that the sale was *ultra vires* is a mere conclusion of law. 12 Ency. Pl. and Pr., 1035. (5) If we concede the contention of the plaintiffs, that they can not be forced to accept stock in the succeeding corporation, it by no means follows that they could set aside this sale. If they had promptly filed their bill for an injunction, prior to other parties becoming interested, all they could have accomplished would have been security for the payment of the value of their stock when judicially ascertained. Lauman v. Railroad, 30 Pa. St. 42, 72 Am. Dec. 685. Certainly they can not be put in

a better condition and be entitled to broader relief by reason of their delay. Black v. Railroad, 24 N. J. Eq. 470. As the statute does not authorize either party to institute proceedings in condemnation to ascertain the value of the stock, the plaintiff may resort to any common law remedy to fix and collect the damages. Lindell's Admr. v. Railroad, 36 Mo. 545; Soulard v. St. Louis, 36 Mo. 546. The Legislature not having enacted a law by which the stockholder's shares taken can be valued, the stockholder may pursue any common law remedy. Hickman v. Kansas City, 120 Mo. 117. (6) The measure of damages in the common law action and in a condemnation proceeding is the same. McReynolds v. Railroad, 110 Mo. 484. (7) Two separate and distinct causes of action antagonistic to each other and against different parties are united in the same petition. The first cause of action is to set aside the sale of the Lindell Railway Company property because of the alleged fraud. This is, of course, a disaffirmance of the sale. The purpose of that cause of action is to set aside the sale, and restore the status of the property to what it was before the sale. The second cause of action is to recover the alleged profits made by the individual defendants, and must of necessity be an affirmance of the sale. If "the remedies are not concurrent," plaintiffs must elect. Rodermund v. Clark, 46 N. Y. 354. "But these remedies, being inconsistent, can not be both prosecuted and maintained." Bowen v. Vandeville, 95 N. Y. 237; Lloyd v. Brewster, 4 Paige Ch. 537, 27 Am. Dec. 88; Smith v. Hodson, 2 Smith's L. C. (9 Ed.), Am. notes, 1383; Broom's Legal Max., 167; 18 Ency. Pl. and Pr., 791; 1 McQuillen's Pl. and Pr., sec. 192. The restoration to the *status quo* is a condition precedent to the right of rescission. Robinson v. Sipple, 129 Mo. 208; Bigelow on Fraud, 5411. Plaintiffs holding only a few shares out of the 25,000, it is out of their power to restore the United Railways Company and its bondholders and shareholders to their *status quo*. Milton v.

Smith, 65 Mo. 315; Buford v. Keokuk Packet Co., 69 Mo. 611. Plaintiffs can not bind the other holders of stock of the Lindell to contribute towards restoring the *status quo;* and the single question is: Will the court endanger every other interest for the purpose of protecting what may turn out to be a very small fraction of the real interest? Symmes v. Trust Co., 60 Fed. 856; 12 Ency. Pl. and Pr., 831. (8) The plaintiffs were guilty of such laches, as to estop them in equity from setting aside the sale. R. S. 1899, sec. 1187; 2 Cook on Corp. (4 Ed.), secs. 600, 731; Martin v. Railroad, 8 Fla. 370, 73 Am. Dec. 721. To stand by and allow others to invest, as this bill shows was done, would be inequitable. 1 Thompson on Corp., sec. 80; 4 Thompson on Corp., sec. 4534; Hat Co. v. Eixkemeyer Co., 90 N. Y. 611; Feld v. Inv. Co., 123 Mo. 603; Zabraska v. Railroad, 23 How. (U. S.) 398; Com. v. Cullen, 53 Am. Dec. 467; Stokes v. Detrick, 76 Md. 226, 23 Atl. 486; Tash v. Adams, 10 Cush. 252.

VALLIANT, J.—This is a suit in equity. The plaintiffs are stockholders in the Lindell Railway Company, a corporation chartered by an act of the General Assembly approved January 26, 1864, for the purpose of constructing and operating certain lines of street railways in the city of St. Louis and the county of St. Louis. The defendants are the Lindell Railway Company, The United Railways Company of St. Louis, The St. Louis Transit Company (the two last named being street railway corporations), the St. Louis Trust Company, and certain individuals who compose the officers and board of directors of the Lindell Company, and who compose also the officers and board of directors of the two other street railway companies.

In the circuit court a demurrer to the plaintiffs' second amended petition was sustained, and plaintiffs declining to plead further there was a final judgment for defendants, from which the plaintiffs prosecute this appeal.

The petition copies in full the act of 1864 by which the Lindell Company was incorporated, and next states that under the provisions of sections 2779, 2780, 2781, Revised Statutes 1889, the charter of the corporation was amended to enable it to extend its business and add to its lists certain other lines of street railways in the city and vicinity. The pleader then draws the legal conclusion that the original charter and the amendment mentioned constituted a contract having three relations, viz.: it was, first, a contract between the State and the corporation; second, one between the corporation and the stockholders; and, third, one between the stockholders *inter sese*. The further conclusion is drawn that all the rights and powers of the parties to that contract are to be found within the terms of the charter and its amendment, and that among them is not found the "power to convey away all the property and franchise of said Lindell Railway Company and to abandon its corporate business without the unanimous consent of all its shareholders."

The petition further states:

That on January 26, 1899, plaintiffs became the owners of certain shares of the Lindell stock, which on that day stood and still stand on the books of the corporation in plaintiffs' names; that at that time the individual defendants were the owners of two-thirds of the shares of stock and constituted the board of directors and managing officers of the corporation. That during that month those defendants conspired with a certain banking concern in New York and other persons unknown to plaintiff to sell all the assets, franchise and property of every description of the Lindell Railway Company to a corporation, to be formed, to be controlled and managed by themselves as stockholders and directors and officers, for their own profit without regard to the rights of other stockholders. That the scheme was kept secret from the plaintiffs and was not known to them until September 30, 1899. That in pur-

suance of that scheme the individual defendants pur-
chased and acquired control of a corporation called the
Central Traction Company and changed its name to
United Railways Company, and on the sixteenth of
September, 1899, increased its capital stock from $5,-
000,000 to $45,000,000, and on September 19, 1899, they
as directors of the Lindell Company executed a quit-
claim deed whereby for the nominal consideration of
one dollar they attempted to convey to the United Rail-
ways Company all of the "assets, franchises and prop-
erty of every kind and nature whatsoever," belonging
to the Lindell Railway Company. That the deed was
executed without the knowledge or consent of plaintiffs,
against their wishes, in fraud of their rights and was
not discovered by them until it was put on record Sep-
tember 30, 1899. That at the date of the deed the Lin-
dell Company owned seventy-five miles of street rail-
way in the city and county of St. Louis and other prop-
erty "worth many millions of dollars;" it had a
capital stock of $2,500,000, divided into 25,000 shares
of the par value of $100 per share, its assets were
largely in excess of its liabilities, its business was being
profitably conducted and increasing and it was paying a
dividend of one and a quarter per cent quarterly on its
capital stock, but by that deed the corporation was in-
capacitated from doing the business for which it was
created and its earning power totally destroyed.

That besides the property of the Lindell, The
United Railways Company about the same time bought
"the property, capital stock, and franchises of a num-
ber of other street railways in the city of St. Louis,"
the aggregate capital of all the companies so bought was
$19,275,000, carrying a bonded indebtedness of $13,-
980,000, making a total liability of $33,255,000. That
the United Railways Company had no other property
except that so purchased, yet thereupon it predicated an
issue of its capital stock to the amount of $45,000,000,
and a bonded indebtedness of the same amount, making

a total of $90,000,000, being an excess of $57,744,900, over and above the aggregate amount of stock and bonds which had been predicated on the same property and franchises in the hands of the original companies, of which excess the individual defendants took a large share to themselves. That the bonded indebtedness just mentioned is secured by a deed of trust to the defendant, the St. Louis Trust Company, as trustee, which company took the deed with full knowledge of the facts above stated; the deed of trust covers all the properties acquired by the United Railways Company as above stated, including that of the Lindell Company, and is on the records in the office of recorder of deeds in the city of St. Louis and in the county of St. Louis.

That on September 30, 1899, the United Railways Company leased all the property so acquired by it to the St. Louis Transit Company by a deed recorded October 19, 1899, for a term beginning October 1, 1899, and ending April 1, 1939, and all the property is now in the possession of and being operated by the Transit Company, which company was organized for that purpose by the same men who organized the United Railways Company and is under the same management and ownership.

The petition then goes on to state facts to show that it would be useless to ask the officers of the Lindell Company or the directors or the stockholders, other than the plaintiffs themselves, to bring this suit, hence they bring it in their own names for the benefit of themselves, and such other stockholders, if any, as may see fit to join herein.

The petition then proceeds rather in the form of an argument than of a pleading to discuss an act of the General Assembly entitled, ''An Act to revise and amend chapter 155 of the Revised Statutes of Missouri, 1889, entitled 'street railroads,' '' approved, June 19, 1899 (Laws 1899, p. 374), which the plaintiffs are advised is relied on by the defendants for authority for

the deeds now complained of. Much of that act is copied into the petition. The features of it to which particular attention is drawn are those which authorize to a street railroad company "to sell, lease or dispose of its stockholders' at a meeting called on notice therein prescribed, to "purchase, lease or acquire by other lawful contract" the capital stock, bonds and property of other street railroad companies, and to hold and operate the roads so acquired; and a corresponding power given to a street railroad company "to sell, lease or dispose of, by any other lawful contract, to any other street railway company, its railroad, rights, franchises," etc., by a like vote at a meeting held on a like notice. The act authorizes street railway companies in existence at the date of the act to come under its provisions by conforming to certain requirements therein specified which include payment of a fee to the Secretary of State and taking out a certificate therefor, the fee being $50 for the first $50,000 of capital stock and $5 for every additional $10,000 of its stock.

The petition alleges that the Lindell Company never complied with the requirements of that act necessary to bring itself under the provisions thereof, but that nevertheless a stockholders' meeting was held, as if under that law, on the notice therein required, and at that meeting two-thirds of the stockholders voted to authorize the sale of the company's property now complained of and the deed was executed on that authority, but these plaintiffs had no actual knowledge of that meeting and never consented to the act. At that meeting it was voted that the stock was worth $170 a share and that price should be paid to the minority shareholders and an agreement was then made by the Lindell Company with the United Railways Company for the latter to pay to the minority shareholders that sum per share of their holdings, but plaintiffs would not accept that sum.

The pleader draws the conclusion that under the

original charter of the Lindell Company and the amend-
ments thereto, the plaintiffs had the vested right to have
that corporation operated as long as it could be so with
profit, that this was a right bedded in contract between
the State and the corporation, the corporation and the
stockholders, and the stockholders *inter sese*, and that
neither the State by its subsequent legislation, nor the
corporation assuming to act under such subsequent leg-
islation, nor the stockholders themselves, could impair
the obligation of that contract, in which the plaintiffs
are protected by the Constitution of the United States
and the Constitution of the State of Missouri.

The petition prays that the quitclaim deed from
the Lindell Company to the United Railways Company
be cancelled and held for naught, that the lease to the
Transit Company and the mortgage to the St. Louis
Trust Company, in so far as they purport to cover the
property of the Lindell Company, be cancelled, that the
property of the Lindell Company be restored to it un-
incumbered by anything the United Railways Company
may have done or suffered, that the Transit Company
account to the Lindell Company for the earnings of its
property, and for general relief.

Appellant assigns for error the sustaining of the
demurrer to the petition and the judgment thereupon.

The legal proposition which lies at the foundation
of the plaintiffs' case is that by the implied contract
between themselves, the corporation and the other stock-
holders arising out of the relation of corporation and
stockholders, the property of the corporation was to be
used to carry on the business for which it was created
and that it was not lawful for the board of directors
without the unanimous consent of the stockholders to
sell all of its property and thereby render it incapable
of doing business. The plaintiffs say that such was the
law when they invested their money in the stock of the
Lindell Railway Company, that they have never con-
sented to a change of the contract in that respect, and

that neither the corporation nor the other stockholders nor even the State itself could impair the force of that contract.

The legal proposition as stated by the plaintiffs is to be found in the text-books and the many decisions cited in the brief of their learned counsel, among which is our own decision in Feld v. Roanoke Investment Co., 123 Mo. 603.

That is a principle of law founded in justice and is applied to protect the weak against the strong—when the weak is right and the strong is wrong—it is applied to prevent or relieve against an unjust abuse of the power of the majority. It is not an unqualified rule of law. None of the authorities cited says that a sale of all the property of a corporation pursuant to a resolution of a majority of its members is void. They all recognize that the majority in interest have the right to rule within reasonable bounds and that whilst they have no right, arbitrarily or oppressively, to close out a corporation for their own advantage yet they are not compelled to continue an unprofitable business or to pay the minority more than their stock is worth for the privilege of closing it up. The principle invoked by the plaintiffs is wise and just, but, since it is liable to abuse, its wisdom and justice are seen only in its application to the facts of the given case. It is, as before said, designed for the protection of the minority, but like some other equitable principles it is to be used as a shield, not as a sword. When, therefore, the principle is invoked in a court of equity, the case turns on a question of remedy, the court applies the law *ex aequo et bono,* with due regard to the rights of the plaintiff and also with due regard to the rights of the defendants and others whose interests may have become involved. Because all the stockholders have not consented to the sale it does not follow that the sale will be set aside regardless of the consequences. Sometimes when the act is stained with

bad faith and only those who are guilty of the wrong are to be affected, the court will set aside the sale and restore the conditions as they were before. [Abbot v. American Hard Rubber Co., 33 Barb. 589.] And sometimes, when the plaintiff is prompt, the court will enjoin the sale. [Zabriskie v. Railroad, 18 N. J. Eq. 178.]

But the issuance of an injunction even when promptly applied for is always in the sound judicial discretion of the court. "The courts will require a very strong case for the granting of an injunction which will cause more injury than it will remedy, and it may be said, as a general rule, that an injunction will not be granted when it will be productive of greater injury than will result from a refusal of it. This rule is especially applicable when the party applying for an injunction has by his own laches made it impossible to grant the injunction without inflicting serious injury on the party so to be enjoined. In determining which way the balance of convenience lies, the resultant benefit and detriment to the parties litigant are not the only matters to be considered. The court will also consider the injuries which may be inflicted on strangers to the suit and to the public generally." [16 Am. and Eng. Ency. Law (2 Ed.), 363.] That doctrine was announced by this court in Bailey v. Culver, 84 Mo. 540.

The reasons for the refusal of an injunction under those conditions are applicable also when the court is asked to decree a rescission of a sale which has gone into effect and other rights have grown out of it.

In Lauman v. Lebanon, etc., R. R., 30 Pa. St. 42, the Supreme Court of Pennsylvania considered a case the facts of which were very much like the facts of this case. The plaintiff was a stockholder in the Lebanon Company, the Legislature had by an act, subsequent to the incorporation, authorized that corporation to consolidate with the Reading Railroad Company and provided that the stockholders of the Lebanon Company were to surrender their stock and take in substitution

and satisfaction thereof stock in the consolidated Read-
ing Company. Plaintiff as minority stockholder brought
suit to enjoin the Lebanon Company from carrying into
effect the scheme of consolidation.   The court decided
that the act of consolidation was in effect an act of dis-
solution of the Lebanon Company; that an act of dis-
solution, like an act of incorporation, was not an act of
the corporation, but an act of its members; that a cor-
poration having a public duty to perform could not dis-
solve without the consent of the State; that with such
consent it could dissolve by vote of a majority of its
members; but that, even with permission of the Legis-
lature, the majority could not dictate to the minority
what they should take in payment of or substitution for
their stock, and, since in that case the only thing that
was offered to the plaintiff was stock in the consolidated
company, the court issued an injunction to "be dissolved
on the defendants giving security to the plaintiff in
double the market value of his stock, to pay for said
stock when its value shall be ascertained."

Railroad v. Bremond, 53 Tex. 96, was also a case of
consolidation, in which the plaintiff who was a stock-
holder objected to the act.   The original charter of the
plaintiff's company did not authorize a consolidation
with another company, but subsequently the Legisla-
ture did authorize it, yet the court held that the plain-
tiff could not be compelled against his will to take stock
in the consolidated company in exchange for his orig-
inal stock.   It was urged that the plaintiff had delayed
two years after the consolidation was effected before
bringing his suit and was thereby estopped to deny that
he asquiesced in it. The court said:   "The delay of the
plaintiff and the effects of that delay might well pre-
clude him from enjoining the further prosecution of the
consolidation enterprise, but not from following up his
equitable interest in the hands of a corporation, which,
by appropriating it without authority and by assuming
the place and obligations of the Houston & G. N. R. Co.,

became equitably bound to compensate him therefor.''
It was held that he was entitled to recover of the new
company the value of his stock in the original concern.

In Ervin v. Oregon, etc., Co., 27 Fed. 625, the general principle for which the plaintiffs in the case at bar
contend is declared in forceful terms.    That was also a
case of consolidation against the wish of the plaintiff
stockholder.    After the majority had effected the consolidation they undertook to impose on the minority a
price for their stock that was not satisfactory.    The
court said (l. c. p. 630):    ''It can not be denied that
minority stockholders are bound hand and foot to the
majority in all matters of legitimate administration of
the corporate affairs; and the courts are powerless to
redress many forms of oppression practiced upon the
minority under the guise of legal sanction, which fall
short of actual fraud.    This is a consequence of the implied contract of association, by which it is agreed, in
advance, that a majority shall bind the whole body as
to all transactions within the scope of the corporate
powers.    But it is also of the essence of the contract
that the corporate powers shall only be exercised to accomplish the objects for which they were called into existence, and that the majority shall not control those
powers to pervert or destroy the original purposes of
the corporators.    [Citing authorities.]    It is for this
reason that the majority can not consolidate the corporation with another corporation, and impose responsibilities and hazards upon the minority not contemplated by the original enterprise, unless express statutory authority for this purpose is conferred upon the
majority.    It is no more repugnant to the purposes of
the association to permit the majority to merge and consolidate the corporation with another corporation than
it is to permit them to dissolve it, and abandon the interprise for which it was created, when no reasons of expediency require this to be done.    A dissolution under
such circumstances is an abuse of the powers delegated

to the majority. It is no less a wrong because accomplished by the agency of legal forms.'' After thus declaring the principle governing the rights of the parties, the court turns to the question of the remedy of the injured stockholder, and on that subject says (l. c. p. 632): ''Applying those principles to the case in hand, although the minority of stockholders can not complain merely because the majority have dissolved the corporation and sold its property, they may justly complain because the majority, while occupying a fiduciary relation towards the minority, have exercised their powers in a way to buy the property for themselves, and exclude the minority from a fair participation in the fruits of the sale. . . . The minority stockholders are therefore entitled to demand their fair share of the transaction and to be placed upon terms of equality with the majority. . . . This results from the rule of equity which entitles those whose property has been misapplied by an agent or fiduciary to follow it into any form in which it has been converted, and impress it with a trust whenever its identity can be traced, or, at their election, to recover the value of the property in any form into which it has been transmuted. [Story, Eq., secs. 1261, 1262.]''

These and other cases cited in the briefs of the learned counsel declare the law to be that when the majority of stockholders against the will of the minority sell all of the property of the corporation and thereby work a practical dissolution of it, the minority stockholders are not bound to take in payment for their stock a pro-rata share of the proceeds of the sale, or, in substitution therefor, the stock of another corporation, but, at their election, may have out of the proceeds of the sale, whether it be money or other property, the market value of their stock at the date of the sale or their proportional share of the proceeds, or they may follow the property into the hands of the purchaser and share in the profits arising from its use in the same ratio that they would have shared if the sale had not been made, and,

if the transaction be made with bad faith, they may,. under some circumstances, as in the New York case above cited, have the sale set aside and a rehabilitation of the corporation, or, if equity requires it, and the application. is timely, as in the New Jersey case, they may have an injunction to arrest the transaction. But the authorities cited do not hold that the sale is void, or that it will be set aside at the suit of a stockholder merely because the corporation was doing a fairly good business and some of the stockholders did not consent to the sale. And what is above said in reference to the choice of remedies the injured stockholder may make, is to be taken with the qualification that when it comes to following the property and demanding a pro-rata share of its earnings after it has passed into other hands and been put to other uses, the choice must be made under the supervision and with the approval of the equity court to prevent the infliction of unnecessary injury. The aim of the court in such case should be to give the injured stockholder, at his election,. the fullest measure of compensation consistent with a protection of the rights of others from unnecessary injury. With these principles in view let us now return to the facts of this case.

After the passage of the act of June 19, 1899, a meeting of the stockholders of the Lindell Railway Company was called on notice of twenty days published as in that act required. At that meeting the holders of at least two-thirds in value of the stock authorized the officers of the corporation to make the sale of all its property and franchises to the United Railways Company. The deed now sought to be set aside was executed pursuant to that authority. Plaintiffs say they had no actual notice of that meeting and were not present, but that they were then holders of certain shares of stock and have never consented to the sale. They do not say how many shares of stock they then held or now hold, and when challenged in the argument to speak on that

point their counsel said it was immaterial whether they owned the other one-third of all the stock, not alleged in the petition to have been represented at that meeting, or only one share each, the principle of law invoked was the same.    The principle of law invoked is the same and will protect the plaintiffs in their rights whether they own one or one thousand shares, but when a court of equity comes to adjust the rights of the parties the proportion of stock held by them respectively is a fact to be taken into consideration in selecting the remedy to be afforded the plaintiffs.    By declining to say how many shares they hold and taking before the court the position that the relief they ask is as applicable to the holder of one share as it is to the holder of any number less than a majority, they invite a judgment of their case as on a holding of one share.  The relative holdings of the plaintiffs and defendants is a fact to be considered when the good faith and good judgment of the transaction is questioned.    In any business concern the proportion of one's interest naturally influences the degree of deference his associates pay to his wishes and judgment—not controlling but influencing their action.    The rule that the majority in interest is entitled to the control within the bounds of good faith is one of universal acknowledgment, and is implied in every contract when the contrary is not expressed.

There were 25,000 shares of stock in this concern of the par value of $2,500,000.   Suppose the plaintiffs are the owners of one share each, of the aggregate par value of $200, and suppose the holders of all the rest see in a merger of the property of the corporation into a large concern an opportunity to greatly increase the value of their investments, and, acting on that idea, sell all the property to be so merged without consulting, or even in the face of the earnest protest of the plaintiffs who believe it will be a bad venture, would there be any ground to suspect that the majority were being actuated by a desire to defraud the plaintiffs, or would there be any

doubt on the point of good business judgment? It might turn out that it would have been better to have followed the plaintiffs' judgment, but prima facie the judgment of the majority would be accepted. The plaintiffs in their petition say that at that time, besides the capital stock, the corporation owned property worth "many millions dollars," carrying a mortgage debt of $1,500,000; that its business was prosperous, paying a dividend of one and a quarter per cent quarterly. Plaintiffs concede in their argument that if the corporation had been insolvent, or running its business at a loss, the majority of the stockholders would have had the right to sell its property and close it up. That concession recognizes a discretion to be exercised by the majority in taking action to avert loss. To what extent that discretion may be exercised may be a question for the court in a given case. It is said that if the corporation is doing business at a loss the majority may close it out. But suppose it is not running at an actual loss, yet at a profit so small that in the judgment of the majority the capital invested is not yielding what it should, and from a business standpoint it should be diverted into a channel that promises better results, is there no discretion lodged in the majority to act in such emergency? Here was an investment of more than two million dollars, earning a dividend of five per cent per annum. The petition says that after the purchase of the property of the Lindell Company and that of other street railroad companies, the United Railways Company increased its capital stock from $5,000,000 to $45,000,000, and issued mortgage bonds to the amount of $45,000,000, aggregating liabilities to the amount of $90,000,000, with the result that the company which is composed of the same individuals who sold the property of the Lindell, received as the proceeds of the transaction a net gain of $57,744,900, a large share of which those individuals appropriated to themselves. In the face of those figures the plaintiffs do not aver that the

transaction on the whole was a bad business venture, or that the stockholders of the Lindell who participated in it were damaged; and they do not say that they were denied the privilege of participating in it on equal terms with those who did.

They ask that the sale be set aside and that the Lindell Company be rehabilitated in its former property and set to work under its own charter. This they ask, not upon a showing that any wrong has really been done them, not that the transaction was not fair and profitable, not that they were not afforded an opportunity of participation in it to the same extent that was accorded the most favored, but upon the bare naked legal proposition that it is a violation of the implied contract between the stockholders *inter sese*, to sell the property of the corporation so as to disable it from doing business without the consent of all. To concede to the plaintiffs the right to annul the sale under those conditions would be to place the holder of one share of stock in position to dictate to the majority the terms on which a sale might be made, giving him an advantage which reason and justice can not approve. That is not the law.

If under those circumstances the sale was a breach of the implied contract the courts of law are open to the plaintiffs to sue for damages for the injury, but there is nothing in the case to arouse a court of equity into action. If the court should grant the plaintiffs' request and set aside this sale, who can foresee the consequences that might result? What would become of the interests of those people who may have invested in the $45,000,000 of stock of the United Railways Company, or those who may have invested in the mortgage bonds or in the stock of the Transit Company? If the deed from the Lindell Company to the United Railways Company be set aside, all the investments that may have been made on the faith of that deed must fail.

It is not necessary in order to redress the plaintiffs' wrongs that any such remedy be applied. They are en-

titled to recover in a proper proceeding the value of their stock at the time of its conversion if they elect to consider it a conversion, or they are entitled, if they so prefer, to have the same proportion of United Railways stock given to them in exchange for their Lindell stock that was given to the individual defendants in exchange for theirs, or if they prefer to hold their Lindell stock they may have their proportion of the earnings of the Lindell property in the hands of the United Railways Company or the Transit Company, but they are not entitled to pull down the whole new structure that has been built upon the properties that have been transferred to the United Railways Company under the circumstances stated in the petition.

In the very able argument of the learned counsel for appellants it is said: "No matter whether the relief asked for is the relief which plaintiffs are entitled to or not, if they were entitled to any relief whatever the demurrer should have been overruled." If they were entitled to any relief whatever on the case as stated in their petition the demurrer should have been overruled. But the court can not, out of the materials at hand, construct a case for them different from that made by themselves, for the purpose of affording them some relief, which they do not ask. This is a suit in equity, wherein the plaintiffs repudiate the contract their business associates have assumed to make for them; the court can not, therefore, give them a money judgment, as in an action at law, on a theory of ratification of the contract. Nor can they, while repudiating the transaction and refusing to surrender their stock, receive stock in the United Railways Company in exchange. Neither is there any foundation in the petition upon which the court could build a decree admitting the plaintiffs to a participation in the earnings of the United Railways Company or its lessee in the form of dividends on their Lindell stock. The petition is not drawn on any such theory. Their petition, as correctly interpreted by

themselves in their brief, entitles them to a cancellation of the deed and a rehabilitation of the Lindell Company, or it entitles them to nothing. In the closing words of their brief they say: "It is the only appropriate remedy under the circumstances and no bar stands in the way of its being granted."

It is the plaintiffs' second amended petition; it is, as it were, their ultimatum; when the demurrer was sustained they declined to plead further, declaring in effect that they wanted only what they were entitled to under that petition.

There is nothing in a court of equity for the plaintiffs on the case there stated.

What is above said disposes of this appeal without deciding whether or not the act of June 19, 1899, was valid to confer on two-thirds of the stockholders the power to authorize the sale in question. We have considered that act only as it confers on the corporation or its stockholders the State's permission to do what was done.

There are other interesting questions discussed in the briefs of the learned counsel but since the case is decided before those questions are reached it would not be proper to consider them. The judgment is affirmed. All concur, except *Burgess, J.,* absent.