ERMAL WOLLUMS BY W. P. WOLLUMS, NEXT FRIEND, RESPONDENTS, v. MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION, RESPONDENT. —46 S. W. (2d) 259.

Kansas City Court of Appeals. December 7, 1931.

*DuBois & Miller* and *F. P. Stapleton* for respondent.

*Edward G. Robinson, P. E. Horan* and *McKnight & Redman* for appellant.

BLAND, J.—This is an action on a policy of accident insurance. There was a verdict and judgment in favor of plaintiff in the sum of $1258 together with the sum of $127.30 for damages and $500 for

attorneys' fees as penalties for vexatious refusal to pay the loss. Defendant has appealed.

The policy provided for an indemnity of $80 per month so long as insured lived and suffered a total loss of time, within the meaning of the policy, and, in addition, for certain specific losses mentioned in the policy, including the loss of life. The payments provided were to be payable at the end of each month of disability. Plaintiff sued for a total loss of time, suffered by reason of having been struck by lightning on August 2, 1929, for a period beginning with the date of his injury to the filing of the suit.

In its answer and cross-bill defendant set up five separate grounds of defense: (1st) A general denial; (2nd) A defense founded upon the answers made in plaintiff's application for the policy, in which he stated that he was physically and mentally sound and had not received medical or surgical advice or treatment and had not been afflicted with any local or constitutional disease within the past five years. It was also alleged that in his application plaintiff agreed that the policy should not become binding upon defendant unless accepted while insured was in good health and free from injury; that the statements made in the application were warranties; that plaintiff falsely and fraudulently misrepresented the true state of his health, in that, he had been afflicted within the past five years with measles from which he had not fully recovered at the time of the making of the application; that he was further afflicted with disorders of the internal secretions and particularly with endocrine glands; that these disorders with which plaintiff was afflicted contributed materially to his present physical condition and to the contingency and event upon which he claims the policy has become due and payable: (3rd) That the policy provided that due proofs of loss should be made as a condition precedent to insured's right of recovery for the loss; that the company requested that proofs of loss be verified by plaintiff and his attending physician and that plaintiff had failed and refused to make such verifications and pleads that the action be abated as the suit was prematurely brought.

By its fourth ground of defense defendant attempted to convert the cause into one in equity by praying for the cancellation of the policy and that the cause be dismissed upon the ground that plaintiff in his application had stated that his average monthly earnings exceeded the monthly indemnity payable under the policy, which, as before stated, was $80; that said application was fraudulently made for the purpose and design of deceiving defendant and procuring for the insured a policy at a higher rate of compensation than he otherwise would be entitled to; that the company would not have provided for $80 per month indemnity for total disability if it had known the facts; "that the determination of this action, unless said policy be cancelled for fraud in its procurement, could not defeat

all liability under the policy for other contingencies that may arise during the life of said policy and that the defendant may and could be subject to further litigation because of other liabilities which may and could have accrued under said pretended policy and that cancellation of said pretended policy is the only means by which future loss and further litigation can be uprooted and defeated. Defendant says that by reason of the premises it is without an adequate remedy at law.'' The answer recites that defendant tendered $56, the amount of the premiums paid, with interest.

The fifth ground of defense alleged that defendant reaffirmed and' realleged all of the allegations in the second and fourth grounds of defense, which were made a part of the fifth defense and, in addition, it charged that the application for the policy was taken by defendant's agent, Fred Childers, who was at the time an employee of plaintiff's father and next friend in this action; that Childers knew that plaintiff was not earning in excess of $80 per month, knew that he was not a farmer, as he had represented in his application, and knew, in fact, that he was a student with no earning capacity; that he forwarded the application to the company without making a full disclosure of the facts with reference to the occupation and earnings of the applicant; that one Howard, whose duty it was to collect premiums upon policies of insurance issued by defendant, lived in the vicinity of said plaintiff and that he received the premium from plaintiff and remitted it to the company; that at the time he received the premium and at the time of making application for the policy, Howard knew that plaintiff was not making $80 per month, knew that he was a student, that he had no earning capacity and was not an insurable risk for loss of time; that Howard failed to advise the company of the facts in remitting the premium. In this defense the same allegation was made as that we have quoted from the fourth ground of defense and contains a prayer for cancellation of the policy.

On motion of the plaintiff the fourth and fifth grounds of defense praying for a cancellation of the policy, were stricken out. A reply was filed consisting of a general denial and an allegation that defendant had full knowledge of all matters and things alleged and contained in defendant's answer at the time it issued the policy and that such matters were waived and defendant was estopped and should not be permitted to assert any of said matters; that plaintiff furnished all proofs of loss required by defendant which were applicable to the condition of plaintiff; that defendant never requested that plaintiff furnish any affidavit of his attending physician and that the only blanks for proofs of loss furnished plaintiff by defendant were not applicable, but were only applicable after plaintiff's disability had terminated. The reply further pleaded a waiver of the proofs of loss.

Defendant asked that the cause be tried in equity, which request the court denied. Defendant excepted to the action of the court in striking out its fourth and fifth defenses and refusal to try the case in equity, on the ground that the action of the court was violative of section 30, article 2 of the Constitution of this State and section 1, article 14 of the Constitution of the United States and that section 6142, Revised Statutes of Missouri 1919 was unconstitutional and void, as being violative of said provisions of the Constitution of this State and of the United States.

Plaintiff introduced testimony tending to show that about 7:30 P. M. of August 2, 1929, he was feeding hogs in his father's barn lot; that he had been carrying corn from the corn crib and breaking the ears over a fence post; that the post had connected with it wires running in each direction therefrom, the lower part of the fence consisting of woven wire and the upper part of barbed wire. He testified:

"Just when I was breaking it (the corn), the lightning came. I remember the lightning before falling; it seemed like big balls of fire were going in all directions, it seemed like holding a shotgun in front of you and firing it off, with powder from the shotgun flying around. I fell down unconscious. After a little I tried to get up, scrambled around on the ground quite a while, but had difficulty in getting up. After I got up it seemed like I took hold of the fence to try to assist me to get up. I don't know for sure, and started off and just staggered like a drunk man would, from one side to the other. I couldn't see very good."

When he came to he had a tingling and sensation of numbness in his hands and left side; that "it seemed kinda like a fire burning." He testified that he was standing a foot or two from the fence at the time he saw the flash of lightning and was rendered unconscious. His parents and other members of the family noticed him coming to the house in the condition described above. He ate a light supper, sat around a while that evening and went to bed. He did not sleep well that night. On the next day he stayed in bed most of the time. Thereafter he continued to have bad dreams, was nervous and frequently got dizzy. He was up and about for a day or two but was in bed the biggest part of the next two months. He complained about his fingers feeling like needles were sticking them. Since the lightning shock he had a "hurt" in his left side about the heart. He had never experienced any of these pains or sensations prior to the shock but had been in good health and worked up to the day of his injury. Since the injury he had been up and down. Sometimes he would be in bed for two or three days or a week, then would get up. His condition first improved and then got worse. The least effort caused him to become exhausted. His heart would take fluttering spells. He has

been unable to do any work since the accident. Since that time he has been bothered a great deal with constipation but had never before had any trouble in this regard. He has lost about fifteen pounds in weight. At the time of the trial he was suffering from Bright's disease. He was eighteen years of age when injured.

The record discloses that on the evening plaintiff received the shock a very severe electric storm took place in the community. A neighbor saw sparks shooting from the bed on which he was lying. A tree in the pasture of the Wollums' farm was struck by lightning and a sliver was broken off of a window in the Wollums' home where the telephone wire entered the dwelling. Several witnesses noticed and testified as to the intensity of the storm.

Defendant insists that the court erred in striking out its defenses set up in subdivision four and five of its answer; that the action of the court in so doing was equivalent to sustaining a demurrer to these parts of the answer. In this connection the parties have discussed at length the applicability of section 5732, Revised Statutes Missouri 1929 (section 6142, R. S. 1919) which reads as follows:

"No misrepresentation made in obtaining or securing a policy of insurance on the life or lives of any person or persons, citizens of this State, shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed in any case shall be a question for the jury."

It is defendant's contention that this statute does not apply as the matters complained of in defenses four and five were such as could not have, under any circumstances, contributed to the contingency or event upon which the policy should become payable; that they went to the question of the moral risk and the amount of hazard assumed by it in writing the policy; that this was particularly true in regard to plaintiff's answer concerning his earnings and his being a farmer; that defendant would not have issued the policy, for plaintiff was an uninsurable risk for an indemnity policy with the company, under such circumstances; that there was no meeting of minds and, therefore, no contract was made between the company and the plaintiff; that, as the matters set forth in these subdivisions of the answer could not have contributed to the contingency or the event upon which the policy became payable, section 5732, providing for a trial by jury of the issues therein mentioned, has no application and, defendant had a right to file its cross-bill asking for a cancellation of the policy.

As far as the right, if any, of the defendant is concerned to have the policy cancelled for the reasons pleaded in said subdivisions of its answer, it was not greatly changed by the enactment of the statute

(section 5732, R. S. 1929) whether the representations could have contributed to the contingency or event maturing the policy. If defendant had the right prior to the adoption of such statute to have the policy cancelled for said reasons, it now has such right, except where, as here, the beneficiary sues. [Aetna Life Insurance Co. v. Daniel, 42 S. W. (2d) 584; Life Ins. Co. v. Glaser, 245 Mo. 377; Kern v. Am. Legion of Honor, 167 Mo. 471, 488.] However, the general rule is, regardless of the statute, that after the happening of the contingency or event upon which the policy was to become payable, the rights and obligations between the parties become fixed and absolute and the sums insured become a purely legal demand, giving the parties the right to have the issues tried by a jury. [Ins. Co. v. Bailey, 13 Wallace, 616; Schuermann v. Union Central Life Ins. Co., 165 Mo. 641; Griesa v. Mut. Life Ins. Co., 169 Fed. 509; Aetna Life Ins. Co. v. Smith, 73 Fed. 318; Jefferson Standard Life Ins. Co. v. Smith, 248 S. W. 897 (Ark.); Des Moines Life Ins. Co. v. Seifert, 210 Ill. 157; Globe Mut. Ins. Co. v. Reals et al., 79 N. Y. 202.]

It is only under very unusual circumstances that a jury trial will be denied and defendant permitted to have the policy cancelled after the happening of said contingency or event. [State ex rel. Life Ins. Co. v. Allen, 306 Mo. 197, 214.] The only circumstance that we have been able to find where an insurance company was permitted in this state to maintain a suit in equity to cancel a policy under such conditions, was the presence of an incontestable clause in the policy. No action to enforce the policy had been instituted and by reason of the presence of such clause the right of the company to raise the issue involved in the suit for cancellation would expire at the expiration of the specified period of time. It was held that the company could maintain cancellation. [N. Y. Life Ins. Co. v. Cobb, 282 S. W. 494, a decision by the St. Louis Court of Appeals.] However, the Springfield Court of Appeals has disagreed with the St. Louis Court of Appeals in this respect and holds that, under no circumstances, can a policy be cancelled after the happening of the contingency or event upon which it is to become payable. [See Aetna Life Ins. Co. v. Daniel, 33 S. W. (2d) 424.] The Springfield Court of Appeals certified the last mentioned case to the Supreme Court, as being in conflict with the Cobb case, and the Supreme Court held that there must be a jury trial where the beneficiary sues. [Aetna Life Ins. Co. v. Daniel, 42 S. W. (2d) 584.] The decisions in those cases agreeing with the decision of the St. Louis Court of Appeals in the Cobb case are based upon the ground that the only remedy the insurance company has, under such circumstances, is a suit in equity to cancel the policy.

In insisting that it had the right to have the present policy cancelled, defendant leans heavily upon the case of Carter v. Met. Life

Ins. Co., 275 Mo. 84. We need not go into a discussion of this case for the reason that it has been commented on more than once by the Supreme Court of this State. The case has been held to be an authority only where the facts are similar to those in it. [State ex rel. Life Ins. Co. v. Allen, supra, l. c. 214; State ex rel. Life Ins. Co. v. Allen, 313 Mo. 384, 391.] The facts in the Carter case are not at all like those in the case at bar. In that case, one, at the instance of the plaintiff, took an examination for one Delmar Ridgeway for the purpose of procuring insurance upon the life of the said Ridgeway and plaintiff then caused the said Ridgeway to execute a will leaving him the insurance. Ridgeway died and plaintiff brought suit against the company. The Supreme Court held that the company had a right to maintain a suit for cancellation of the policy on the ground of the fraudulent conduct of plaintiff. The right to maintain the suit was placed on the theory that the alleged misrepresentations were not, in fact, made by the insured, whereas, the cases holding that the policy could not be cancelled by a suit in equity after the happening of the contingency or event making it due and payable, were cases where the representations were made by the insured. The facts in the case at bar are different, the alleged misrepresentations being made by the insured. Therefore the Carter case is not an authority.

However, defendant insists that the cases holding that cancellation of the policy is not the proper remedy where the event making the policy payable has transpired are ones in which there was no necessity for uprooting the policy on account of the possibility of future litigation, that the judgment in this case is not and could not have been, at the time the court sustained the motion to strike out, "*res adjudicata* as to other accidents or sicknesses which might have occurred during the life of the policy."

The evidence shows that the policy has been cancelled by the defendant and there is no pleading on its part, or any suggesting in its brief, that plaintiff actually sustained any other accident within the terms of the policy during its existence. We do not know what other actions could be brought by plaintiff upon this policy except possibly to recover future payments for disability following the same accident and, should his injury result fatally his beneficiary might sue for his death under its provisions. However, there is no question but that any judgment which might have been rendered in this case after said parts of defendant's answer were stricken out, for or against either party, would have been *res adjudicata*. Had defendant obtained judgment in this suit it could have pleaded it in bar to any future action arising out of this accident where the right to recover anything for the accident was involved. [State ex rel. v. Patton, 271 Mo. 554; Driving Park v. K. C., 174 Mo. 425; Garden City v. Bank, 65 Kan. 345; 34 C. J., pp. 854, 856, 874.] There was, therefore,

no reason why plaintiff should have been deprived of the right of a trial by jury in this case. Defendant had an adequate defense at law.

We have examined the cases of Becker v. Surety Co., 181 Pac. 549 (Kan.), and Wells v. Casualty Co., 100 Atl. 395 (N. J.), cited by defendant and find them not in point. The Kansas case bears no evidence of having been tried in equity and in the New Jersey case the company had cancelled the policy before the death of insured. The New Jersey courts hold (as do ours) that as a general rule, there can be no cancellation after the event or contingency making the policy payable has transpired. [See Wells v. Casualty Co., supra, l. c. 398.]

It will be noted that the answer does not set forth any provision of the policy or any fact which would show that defendant might or could be subject to further litigation because of other liabilities which may or could have been incurred under the policy. In other words, there are no facts alleged but mere conclusions of the pleader, which of course, is bad pleading.

However, defendant insists that the court erred in striking out said defenses for the reason that, if they state no defense giving ground for equitable relief, they, at least, constitute defenses at law; that the prayer of the petition should not be considered in determining whether or not a demurrer thereto would lie. So far as the record shows defendant seems to have raised this point for the first time in this court. The record fairly discloses that defendant strenuously contended in the trial court that these defenses were pleaded for the purpose of obtaining equitable relief. The record does not disclose any suggestion to the trial court that defendant relied upon them as entitling it to a defense at law. Ordinarily the prayer for relief is no part of the petition and will not be considered in determining whether the pleading states any cause of action or grounds for relief. If the pleader is entitled to any relief the court will not sustain a demurrer to the pleading, although he may not be entitled to the relief demanded. [Baldridge v. Ryan, 260 S. W. 536; Barnett v. Ground, 263 S. W. 836; Tanner v. Railway Co., 180 Mo. 1; Paddock v. Somes, 102 Mo. 226.] However, pleadings are for the purpose of informing the parties and the court of the claim made and the issues to be passed upon. They should not be drawn so as to mislead and the court should not be charged with assuming that the pleader intended to conceal one cause of action within another. When a complaint sets forth facts sufficient to support a cause in equity or one at law, the character of the action is determined by the relief sought in the complaint. [Zeizer v. Cohn, 90 N. Y. Sup. 66; Southern Cotton Oil Co. v. Shelton, 220 Fed. 247.] From what we have said the trial court was led to believe and did believe, in passing upon the motion

to strike out, that defendant was setting up an equitable defense and, if there was no equity pleaded, the court's action was proper.

It is claimed that defendant is an assessment company and that, under the statute, it is not subject to penalty for vexatious delay and attorneys' fees. In this connection it is insisted that the court erred in not permitting defendant to introduce in evidence the certificate of the secretary of state, showing that defendant was licensed to do business in this State as a health and accident insurance company upon the assessment plan. It is not contended that this certificate was more than prima-facie proof of the character of the company and the business it was transacting. However, the policy upon its face conclusively shows that this insurance was not issued upon the assessment plan. It is held that the liability of an insurance company is determined by the character of its contracts of insurance and, in order for a contract to be upon the assessment plan, the payments must, in some degree, be dependent upon the collection of assessments upon persons holding similar contracts. [Aloe v. Fid. Mut. Life Ass'n, 164 Mo. 657; Williams v. St. Louis Life Ins. Co., 189 Mo. 70, 91, 92.] There is nothing in the policy in suit tending to show that the payments are so dependent. The fact that the policy provides that: "The acceptance of any premium on this policy shall be optional with the Association, and should the premium provided for herein be insufficient to meet the requirements of the Association, it may call for the difference as required," does not make it an assessment company in the issuance of this policy. [Williams v. Ins. Co., supra.]

It is claimed that there is no evidence of vexatious refusal to pay in this case. We think there is no merit in this contention. In this connection we will also take up defendant's complaint that the court erred in permitting plaintiff to introduce into evidence certain letters written by plaintiff's father, acting as his agent, to defendant in relation to plaintiff's claim, on the ground that they did not tend to show the refusal to pay was vexatious.

· The evidence shows that upon receipt of the injury plaintiff caused defendant to be notified thereof; that it thereupon mailed him blank proofs of loss to be executed by himself and his physician. Sometime after the receipt of these blanks plaintiff's father wrote defendant at its office in Omaha asking whether the preliminary proofs of loss should be filled out and returned, "or would it be all right to have you to send me a final statement when he (plaintiff) gets well as he has been continuously under the care of a doctor and is still not able to do anything. Now this is the second time I have wrote to you in answer to this letter please tell me what to do." On October 26, 1929, defendant wrote the father that the preliminary blanks "should be completed insofar as possible by both claimant and his attending

physician, and returned to this office at once. If we find that final proofs and affidavits are necessary, the usual forms will be furnished for him to complete at the time his disability terminates.'' On December 5th preliminary proofs duly made out were mailed to defendant, the father writing the defendant that if they were not filled out satisfactorily to let them know; that they would give any information desired; that ''as this as I understand is not a final paper you may mail me a final proof of loss but do not know when he (plaintiff) will be able to do anything as he is in very bad shape yet if your company wants to have any person call and see him we would be glad for you to call and see him so you will know his condition by seeing him.''

On December 21st, the father wrote defendant informing it that he had sent in the proofs ''sometime ago'' and would like for it to pay what was owing up to December 1st. It will be remembered that the policy provided that payments should be made at the expiration of each month of the disability. This letter stated that plaintiff was getting worse instead of gaining in health and that it would be impossible for them to tell the company when they would be ready for final settlement.

On January 2, 1929, the company wrote the father saying the complete file of the claim was in the hands of its traveling auditor, who was in the State of Illinois; that it did not have his routing and could not state when he would be in Albany to see about this case; that as soon as it got ''a routing somewhere near your town'' it would write advising him when he might expect the auditor; that it was impossible for the company to take any action without the proofs being filed; that since the auditor had the proofs in his possession it would have to write him to inform it as to when the claim would receive attention. On January 25, 1930, plaintiff's father wrote the company that the auditor had been to his farm trying to settle; that he had only offered him $200 and that the writer wanted the company to pay what was due ''up to the present time and at the end of each month from now on until he (plaintiff) is able to work.'' ''If the proof of loss is not plain enough in any way, we will be glad to give you sworn proof enough to make it satisfactory or send any Doctor you want to.''

On February 3rd, defendant wrote the father: ''We have your's regarding the above, and perhaps you are not familiar with all the facts which we have secured in connection with this case.'' The letter then intimated that plaintiff was making an excessive claim. It stated that it had other means of securing information independent of the insured or his doctor, through a credit association, stating, ''We are enclosing another final proof.'' This blank upon which it was intended to make final proof recites that insured would accept

a check to be mailed by defendant in full satisfaction of claims on account of his injury, or for any further loss resulting therefrom. These blanks were never filled out or returned.

On February 6th, the father wrote defendant, stating, that defendant's letter, in which it intimated it desired the matter looked into by a credit association, was insulting; that instead of writing insulting letters it should send a doctor or any other person to see plaintiff and see if there is anything wrong "about the deal." On February 19th, defendant wrote the father: "We feel that we are quite well aware of all of the important facts in connection with this claim;" that if the father of plaintiff would complete and return the proofs to defendant's office it would take it up before the claims committee together with such information that it then had; that if he preferred it would send one of its representatives to call upon him; that it could not disregard its rights in reference to the claim as it was handling trust funds.

On April 22, 1930, defendant wrote the plaintiff that:

"We are just in receipt of the report of Mr. Cronk's findings and among other things he stated that you were perfectly willing to undergo an examination. Kindly advise on what day we can arrange for you to undergo an examination in St. Joe—this, of course, at our expense.

"We have of course, during the past several months, secured a great deal of information in connection with this case, and inasmuch as you insist that it is legitimate, we must insist on our rights as fixed by the policy and require a physical examination."

On May 1st, plaintiff wrote the company stating that it would be all right for it to have any doctor to examine him that it saw fit; that he would come to St. Joseph if it desired to wait until he felt like making the trip; that if it wanted to examine him at his home tha the would be glad for it to do so. On May 14th defendant wrote plaintiff that it thought it would be just as convenient for him to come to Omaha to be examined as for him to go to St. Joseph and suggested that he come to the former place for examination, offering free transportation and to pay all expenses.

On May 22nd, plaintiff's father wrote defendant that if it could not examine plaintiff in St. Joseph to send some doctor to his home in the near future to make the examination as the writer intended taking plaintiff to the State of Illinois for treatment in a hospital there. "When we think he is able to stand the trip, or if he gets able."

On May 29th, the company wrote the father stating its purpose in having plaintiff come to Omaha was merely for plaintiff's own convenience, but that if he expected to take plaintiff to a hospital in Illinois, it perhaps could arrange to have some examination made there, or on the way there.

On June 23rd, the father wrote the defendant:

"In regard to the policy Ermal Wollums has in your company and has a claim he has been lightning shocked and as you people seem to want to examine him which we have repeatedly invited you to do if you want too.

"Now as we have waited nearly a year on you up to date you have done nothing in the way of filling your contract. Here is a question I want you to answer are you a going to compell us to sue you for our rights in this matter? If so make me a statement to that effect so we will know what attitude you are going to take in this matter.

"If you are going to force me to put this in a lawyer's hands, for collection I want to know it."

On June 26th, defendant wrote the father that it would not do anything about the claim until it knew whether it was "legitimate or illegitimate;" that it had repeatedly asked to have plaintiff examined, offering to pay his expenses to Omaha, but apparently he did not care to submit to an examination; that plaintiff and his father had disregarded all suggestions as to where plaintiff might be examined; that it suggested that plaintiff come to Omaha but it made no difference whether he went there or somewhere else; that it would select its own man to make the examination which would be at its expense.

On June 28th, the father wrote defendant protesting that he and plaintiff had never indicated a refusal to submit to an examination of the plaintiff; that under the provisions of the policy plaintiff was not required to go to Omaha for examination and invited defendant to come to his house anytime or he would submit to an examination in St. Joseph, "but you are going to make some kind of a settlement or I will be compelled to sue you."

On July 8th, defendant wrote the father, calling attention to the provision of the policy providing that defendant should have the right to make a physical examination of the insured when and so often as it required; that in view of plaintiff's failure to submit to a physical examination there was a very serious question as to "further coverage of the claim." It suggested that if the father took plaintiff to St. Joseph to let it know so it could have him examined there; that "For your convenience, however, in complying with the provisions of the policy relative to proof of loss, we enclose herewith an intermediate blank which should be completed in full detail and returned to this office as soon as possible." The blank proof of loss accompanying this letter of defendant recites: "This blank is furnished for the purpose of making proof and should be filled out and returned as soon as *disability has terminated.*" (Italics ours.) The blank on its face shows that it was intended for policy holders who

660

were making claims on account of sickness and not on account of accident.

On July 20, 1930, the father wrote the defendant that:

"It looks as your company is not going to do anything in the way of settling on the terms of this policy without being forced to do it. What they are entitled to do now if this is the stand you are taking in this matter please be plain out in the matter;" that unless the company settled within the next ten days he would turn the matter over to his attorney. On August 1st, the company wrote the father stating that no further action on the matter could be had unless and until proofs of loss were furnished upon the forms that had already been furnished by it.

On August 2nd, the father wrote defendant that it had enough proofs in this case on which to make settlement and that it was merely procrastinating in the matter of paying, but if it desired further proofs to send the proper blanks; that as many as it might send would be filled out; that the last one sent was "for sickness and not accident;" that "I will say once more, get busy or we are going to settle at the court house."

On September 11th, the father wrote defendant that he had waited long enough for the settlement; that it had been repeatedly invited to send its doctor to see plaintiff and "you do nothing in any way only try to get the policy before the boy is well," and stating that he would wait a few days before suing in order to give it an opportunity to settle.

On September 19th, defendant wrote the father that nothing further could be done until affirmative proof had been furnished upon the blanks that had been sent by the company. On September 22nd, the father wrote defendant that he had offered to have executed any kind of papers that it would send "for accident." Thereafter the father wrote defendant several letters attempting to have the claim settled. No settlement was made and, on November 6, 1930, this suit was instituted. Defendant's physician examined plaintiff at his home after the suit was brought.

Defendant objected to the introduction into evidence of the letters written by the plaintiff to the company, on the ground that they were not competent upon the question of vexatious refusal to pay. It was necessary to introduce the correspondence on both sides in order to understand the nature of the situation. Plaintiff and his father were maintaining at all times that plaintiff was entitled to payment of the monthly indemnity at the times it fell due, which was upon the first of each month after the accident. However, they were attempting to comply with the request of the defendant in reference to signing proofs of loss and plaintiff's submission to a medical examination. The evidence shows that while defendant was insisting

upon further preliminary proofs of loss before making payment that it did not send the proper proofs for this purpose; that one of the blanks sent, if executed by plaintiff, would have denied him recovery for any future loss. Under the terms of the policy, of course, he was entitled to such recovery, and defendant had no right to make any such demand. The blank proof mailed plaintiff's father on July 8, 1930, was intended to be an intermediate blank but it recited that it was a blank to be furnished as soon as disability was terminated. Upon its face it was a blank intended to be made out under a policy of health insurance, not accident, and although defendant's attention was called to the matter by plaintiff's father, it never sent any other blank. While it might possibly have been filled out and returned without committing plaintiff in any way, it was not the proper blank to submit and its attention was called to the matter.

The correspondence tends to show that defendant was attempting to have the medical examination made at some place other than plaintiff's home or at some town in its vicinity, either Omaha or St. Joseph or some other place. Plaintiff was willing to go to St. Joseph, although the record fairly discloses that it really was not convenient for him to go there for he was not feeling equal to the task. There is nothing in the policy requiring plaintiff to go so far away from home to be examined. The evidence shows that plaintiff and his father were attempting to comply with all reasonable requests of defendant. The evidence also shows that, although negotiations for settlement had extended for over a period of more than a year, no conclusion was ever arrived at by the defendant as to whether it would or would not pay the claim. It is worthy of note that defendant continued to make veiled insinuations against the claim, using such language as "perhaps you are not familiar with all of the facts which we have secured in connection with this case," but was not fair enough to state what this information was that was delaying the settlement. All the facts and circumstances surrounding these negotiations were for the attention of the jury on the question as to whether or not defendant was vexatious in its attitude, and the correspondence was properly admitted in evidence. The fact that the letters written by plaintiff and his father contained some self-serving statements did not make them inadmissible. Most of their contents bore directly upon the question of vexatious refusal to pay and the court was not required to separate the wheat from the chaff. [Third Nat'l Bk. v. Yorkshire Ins. Co., 218 Mo. App. 660; Fay v. Aetna Life Ins. Co., 268 Mo. 373, 389.]

It is insisted that the court erred in striking out the following part of defendant's answer:

"Became advised and informed that W. P. Wollums, the father and next friend of the minor insured, in this action, has made nu-

merous and various claims against insurance companies on policies of insurance against loss by fire carried by him on properties owned by him, and.''

The quoted matter was pleaded in connection with the defense of failure to furnish proofs of loss and why defendant wanted the proofs verified. We fail to see how there could be any error in the action of the court in striking out that part of the answer. Because an agent has been guilty of fraudulent misconduct in his own affairs, unconnected with those of his principal, should not prejudice the rights of the principal when the agent is acting in a similar matter for the principal alone. We think that this is self evident and requires no citation of authorities to support it. At any rate, the part stricken out was a pleading of mere evidence.

Complaint is made of plaintiff's Instruction B. This instruction told the jury that if, after making preliminary proof, two blank forms of loss were furnished plaintiff by defendant, ''and that both of said forms showed on their face they were furnished for the purpose of making proof as soon as plaintiff's disability had terminated, and if you further find and believe from the evidence that the disability of the plaintiff resulting from said accident, if any, had not terminated on or before November 6, 1930, then you are instructed that it was not necessary for the plaintiff to fill out or return to said company either of said forms.'' It is contended that it was within the province of the court, and not the jury, to declare the legal effect of the intermediate report. Even if this be so, we see no material error in the submission of the matter to the jury, for the reason that the blank proofs show on their face that they were for final proofs.

It is claimed that the court erred in giving plaintiff's Instruction A for the reason that it permitted the recovery of six per cent interest on the monthly installments from the date said payments became due, telling them they were due at the end of each month of the disability, when all the evidence disclosed that due proof of loss was a condition precedent to the payment of such installments and that such proofs of loss were not made until long after September 2, 1929. The policy provides that all indemnities provided by the policy for loss, *other than that of time on account of disability, will be paid within sixty days after receipt of due proof.* But, ''Upon request of the Insured and subject to due proof of loss all of *the accrued indemnity for loss of time on account of disability will be paid at the expiration of each month* during the continuance of the period for which the Association is liable and *any balance remaining unpaid at the termination of such period will be paid immediately upon receipt of due proof.*'' (Italics ours.) The instruction properly submitted the terms of the policy to the jury as to the time in which the monthly

indemnity should be paid. If defendant wanted to protect itself against the payment of the indemnity until after the proofs of loss were made it could have done so in the policy (as it did in reference to indemnity other than on account of disability), but in this instance it did not. No reason is assigned why interest is not payable upon the installments as they became due. Defendant contents itself with merely stating: "Certainly there would be no interest due on installments before proofs of loss had been furnished or there had been a waiver of the proof of loss, which issue was not submitted to the jury in this instruction directing a verdict." Interest is not allowed upon payments due under insurance policies upon the theory that the company should be punished or penalized for its failure to pay the principal due. There is no question but that the jury were properly instructed to allow interest from that date in this case. [Brown v. Ry. Passenger Assurance Co., 45 Mo. 221, 227; 33 C. J., p. 147.]

It is contended that the testimony of plaintiff that he was injured by lightning is so contrary to the physical facts and so improbable as to stagger human credulity and defendant's demurrer to the evidence should have been sustained. This is based upon expert testimony introduced on behalf of defendant tending to show that it was impossible for electricity to have been carried over the wires of the fence from the tree, where the lightning struck, to the place where plaintiff was injured. It is unnecessary to prolong this opinion by setting out in full the facts with reference to this matter, but we may admit for the purpose of the case, that what the experts said in this regard is true. But plaintiff is not claiming that the bolt of lightning that struck the tree was the one that caused his injury and there is nothing in the record necessarily tending to show that it was. The evidence shows that there was a severe electric storm during the time in question and that the lightning struck in more places than one. If plaintiff's testimony is to be believed, and the jury had a right, we think, to believe it, one of the bolts of lightning must have struck in his vicinity.

There was other expert testimony on defendant's part to the effect that plaintiff's condition was due to congenital causes, that is, that his condition must have been the same prior to the day he claims to have been injured that it was subsequent thereto. There was expert testimony on the part of defendant that one of three things always happen as a result of shock by electricity or when one is struck by lightning. (1st) Immediate death; (2nd) No permanent result and (3rd) results from burned or destroyed tissues. There is no evidence that plaintiff suffered any burns or destroyed tissues in this case and there was no evidence of any paralysis of any of the muscles in the body. Plaintiff's and two of defendant's physicians,

in answer to hypothetical questions, testified that if plaintiff was struck by lightning at the time he claims that his condition could have been due to it. The evidence shows that plaintiff was in excellent health prior to the time he claims to have been injured, which contradicts defendant's testimony that his present condition is congenital. We are not prepared to say, although expert witnesses expressed opinions, in effect, to the contrary, that plaintiff was not injured by being struck by lightning, although he had no expert witnesses on the question. Certainly, if his testimony is to be believed in reference to the phenomenon that occurred at the time, his injury must have been due to lightning. The peculiar characteristics of electricity are not thoroughly understood at this time. Often some strange and inexplicable things occur in reference to it and its results and we do not think that the jury were required to accept the testimony of experts in this instance, in face of testimony of lay witnesses of what occurred, which plainly contradicts the expert testimony.

Defendant attempts to raise constitutional questions in its brief, but as the constitutionality of section 5732, Revised Statutes 1929 and the right to trial by jury of such issues as are raised by the answer are so well established, it cannot be fairly said that such matters any longer involve constitutional questions. [Schuermann v. Ins. Co., supra; Life Ins. Co. v. Riggs, 203 U. S. 243; State v. Swift, 270 Mo. 694.]

The judgment is affirmed. All concur.