HENRY W. KOLKMEYER, Respondent, v. CHI-
CAGO & ALTON RAILROAD COMPANY, Ap-
pellant.

**Kansas City Court of Appeals, November 2, 1915.**

1. **CARRIERS OF LIVE STOCK: Interstate Commerce: Inten-
tion.** An owner of several horses and mules shipped them over
a railroad from Glasgow, Missouri, to Kansas City, Missouri,
receiving a written contract from the carrier to transport them
to the latter place. On the next day after their arrival at
Kansas City he had them transported by another railroad to
Horatio, Arkansas, free of charge. The shipper had in mind
when he shipped from Glasgow that the animals were to be
ultimately taken to Arkansas, but his intention was to get
them to Kansas City where he would find free transportation to
Arkansas. It was *held* that the shipment was intrastate and
not interstate commerce.

2. ——: **Notice of Loss: Waiver.** A carrier may waive written
claim for damages, by accepting verbal claim and entering upon
an investigation of the loss.

3. ——: **Maximum Liability: Consideration: Reduced Rate.**
There may be a valid contract limiting the maximum liability
for animals injured or lost in shipment; but it must be on a
valid consideration such as a reduced rate. And if the rate
charged is in excess of the legal rate it is not a reduced rate.

4. ——: **Live Stock: Propensity of Animals: Burden of Proof.**
When the shipment is of live stock, accompanied by the shipper,
which arrives at destination the burden is on him to show that
the injury was not self inflicted by the propensities of the ani-
mals. But this may be shown by circumstantial evidence. In-
structions examined and error therein *held* harmless.

Appeal from Cole Circuit Court.—*Hon. Jack G. Slate,*
Judge.

AFFIRMED.

*Scarritt, Scarritt Jones & Miller* for appellant.

*Perry S. Rader* for respondent.

ELLISON, P. J.—Plaintiff was a general contractor in grading for railroads and also in revetment work for the Federal government. In 1910 he was engaged, under a contract with the government, in the construction of a levee on the Missouri River at "Wilhite Bend," Howard County, Missouri. He also had a contract with a railroad known as the Kansas City Southern, which was operated through the States of Missouri and Arkansas, to construct a part of its track in the latter State. When he completed his contract in Howard county he desired to take his employees and his work animals (horses and mules) to Horatio, Arkansas, and there carry out his contract with the Kansas City Southern.

Defendant's road run through Glasgow, Howard county, to Kansas City, Missouri, and plaintiff delivered his animals to defendant at Glasgow to be carried by it to Kansas City at a rate of freight of thirteen and one-half cents per hundred pounds and received defendant's written bill or agreement to carry to that place for that price together with free passage for one attendant; plaintiff and his other men going by passenger train and paying fare. After loading the animals, defendant so negligently handled its train between Glasgow and Kansas City as to kill some of them and cripple others.

On arriving at Kansas City the animals not killed were placed in stockyards and on the next day plaintiff shipped them to Horatio, Arkansas over the Kansas City Southern. On account of plaintiff's intending to work for the latter road no charge for freight or passage was made by it. Defendant claimed there was a mistake in the freight rate stated in the written agreement for shipment from Glasgow, saying that it should have been sixteen cents instead of thirteen and one-half per hundred weight. Plaintiff would not agree to this and defendant turned over its claim to the Kansas City Southern for collection. Plaintiff was refused

permission to unload at Horatio unless he paid the freight claimed by defendant of sixteen cents per hundred. There was some question as to other charges which need not concern us now; suffice it to say, plaintiff finally paid a total bill of $50.70. He brought this action against defendant for damages suffered by him in consequence of defendant's negligence between Glasgow and Kansas City and recovered judgment in the trial court.

Plaintiff's petition bases his action on an intrastate shipment, under the State law, from Glasgow to Kansas City, both points in Missouri. Defendant insists that it was an interstate shipment governed exclusively by the Federal law as interpreted by the Supreme Court of the United States. Its base for this contention is that the ultimate destination of the property was Horatio, Arkansas, and that the mere fact of a separate bill or shipping contract to Kansas City only, would not prevent its being a through shipment. In the words of defendant's brief its claim is that ''The billing is immaterial, for the intention of the parties as to the actual destination must govern as to whether or not the shipment was an interstate shipment. If it was the intention of the shipper at the time he delivered the shipment to the defendant at Glasgow, Missouri, to have it transported to Horatio, Arkansas, this would govern over any form of billing.'' It is contended that this proposition is directly supported by the Supreme Court of the United States in Railroad Com. of La. v. Texas & Pac. Ry. Co., 229 U. S. 336 and Railroad Com. of Ohio v. Worthington, 225 U. S. 101.

In the first case proper tribunals of the State of Louisiana were seeking to recover penalties from the railroad for violation of the State law concerning the shipment of certain logs and staves. A proceeding was begun in the Federal court to enjoin the action on the ground that the shipment was interstate, and the decision of the Supreme Court sustained that view. It

appears that there was delivered to another railroad in Louisiana eighteen carloads of logs and staves under a bill of lading naming New Orleans in the same State as the destination. That road hauled them to Alexandria in that State and delivered them to the Texas & Pacific Railroad Company; and the latter took them to New Orleans where the consignees ordered them delivered to certain steamships plying between the latter city and European points to which they were transported by the ships under bills of lading issued by the latter. There was another shipment which we need not notice.

The ground of the decision in that case is that notwithstanding local bills of lading only showing a shipment to New Orleans, it was manifest the *intention* was to make a foreign shipment. The court stated that the character and continuity of a shipment of foreign commerce did not terminate at the seaboard, nor was it terminated or affected by being transported on local bills of lading. And that the shipment "takes character as interstate or foreign commerce when it is actually started in the course of transportation to another State or to a foreign country." Defendant insists that in view of this ruling plaintiff's local bill of lading from Glasgow to Kansas City and a reshipment on another road from that point to Horatio, Arkansas, did not prevent the shipment being one of interstate commerce from the moment it was received at the starting point. But we think this case lacks the controlling fact of that case. Here there was no intention to ship to Horatio when the freight was delivered to defendant at Glasgow. The manifest intention was to ship only to Kansas City at which point plaintiff was to have free transportation to Horatio. Rates of freight and rules of commerce did not concern plaintiff further than Kansas City. The object of his delivery of the stock to defendant at Glasgow was not for a through shipment to Horatio. The object was to get it to a

point where commerce was at an end and plaintiff could have free transportation. The face of the case wholly negatives the idea that a through or continuous shipment was intended to start at Glasgow and end at Horatio. We fail to see any legal objection to one making a shipment locally from place to place, though he may intend ultimately to make a final stop at a point outside the State. Suppose this shipment had been a family carriage and team, or a motor car and that the shipper, for pleasure, or business, had shipped it from place to place within the State, maybe in opposite directions, intending ultimately or finally, (say in a week, a month, or a year) to make his last shipment to some place in another State; would each of these points in the itinerary be a part of an interstate shipment? Would the original shipment be considered the starting of an interstate shipment?

We think the case is within the decision of Gulf, Colo. & Santa Fe Ry. Co. v. Texas, 204 U. S. 403. There corn, originally brought from North Dakota to Kansas City, Missouri, was taken on from the latter point to Texarkana, Texas, and there reshipped to Goldthwaite, Texas, the point intended from the start as the ultimate point of delivery. The shipper kept informed as to interstate freight rates and State rates and he was thereby aware that he could get cheaper transportation by shipping first to Texarkana and then reshipping to Goldthwaite than by a direct shipment to the latter place (See Div. 11, 12 and 13, P. 406 of statement of facts). The controversy was whether the shipment to Goldthwaite was a part of the shipment from North Dakota and therefore interstate, or was it local and intrastate. The decision was that it was the latter. Judge BREWER in delivering the opinion of the court likened the shipment to a passenger. He said: ''In this respect there is no difference between an interstate passenger and an interstate transportation. If Hardin, for instance, had purchased at Hudson a

ticket for interstate carriage to Texarkana, intending
all the while after he reached Texarkana to go on to
Goldthwaite, he would not be entitled on his arrival at
Texarkana to a new ticket from Texarkana to Gold-
thwaite at the proportionate fraction of the rate pre-
scribed by the Interstate Commerce Commission for
carriage from Hudson to Goldthwaite. The one con-
tract of the railroad companies having been finished he
must make a new contract for his carriage to Gold-
thwaite, and that would be subject to the law of the
State within which that carriage was to be made.''

The question is important and difficult and if de-
fendant thinks that we have misconstrued the federal
statute it will have the opportunity of taking the opin-
ion of the Supreme Court of the United States.

The contract of shipment provided that plaintiff
should give written notice of any claim for damages
(not to .any particular officer but to the defendant),
within five days after unloading. It is conceded by
plaintiff that this was not done; but he insists that the
notice was waived. Here again defendant takes the
position that the shipment was interstate commerce
and governed by the Federal law and the decision of
the Federal courts thereunder. We so decided in Ham-
ilton v. Ry. Co., 177 Mo. App. 145. If we are correct
in the view that this was not an interstate shipment,
then defendant's argument fails and the question of
notice and waiver must be determined by authoritative
rulings of the State courts. Those rulings are that a
carrier may properly incorporate a provision for writ-
ten notice of damage in its contract of shipment; but
that such character of notice may be waived. [Rice
v. Ry. Co., 63 Mo. 314; Richardson v. Ry. Co., 149 Mo.
311; Ward v. Ry. Co., 158 Mo. 236; Bellows v. Ry. Co.,
118 Mo. App. 500.] In this case there was evidence
tending to show that defendant was notified of the in-
jury and damage to the stock and that the different

agents notified entered upon an examination and investigation of the claim without intimating a specific claim in writing was desired. These agents secured the service of a veterinary surgeon and also asked plaintiff's consent to kill one of the injured mules and his answer was that if done it must be done on the responsibility of defendant. Finally it was agreed that the question of damage should be deferred and be taken up for adjustment when the animals should reach Horatio. It is clear that the jury was warranted in finding there was a waiver of the written notice.

There was a provision in the contract of shipment containing a stipulation that the value of each animal did not exceed $100 and that the rates were proportioned to valuations.

Accepting the shipment as local and intrastate and therefore governed by the rulings of the State courts, we find this provision is without consideration. On its face it agrees to make the shipment at a reduced rate of freight in consideration of the maximum liability of $100 for each animal. But the evidence showed that in fact the sum actually exacted of plaintiff was not a reduced rate; it being insisted that that charge was an increased rate over that allowed by law. Under the regulation of the statute (sections 3231, 3240, 3241, Revised Statutes 1909), no greater charge than $20.34 for the car containing the stock could have been charged and yet defendant required plaintiff to pay $50.70. It is true that a part of this was said to be made up for feed and for expense of a veterinary. But after deducting whatever should be properly allowed for items other than freight, there remained an excess charge over a lawful rate. It being clear that there was no reduced rate, the contract must fall for want of consideration to support it. [McFadden v. Ry. Co., 92 Mo. 343; Richardson v. Ry. Co., 149 Mo. 312; Paddock v. Ry. Co., 60 Mo. App. 328; Wilson v. Ry. Co., 66 Mo. App. 388; Duvenick v. Ry. Co., 57 Mo. App. 550.]

The following is a part of an instruction which was given to the jury at plaintiff's request: "The law imposes on a railroad company which has received and accepted a carload of live stock for shipment to safely carry said stock and deliver them to the consignee in a safe condition at the usual place of unloading such cars at point of destination. . . . And if the mules and horses mentioned in plaintiff's petition were found to be killed or injured upon the arrival of said car at Kansas City, the burden rests upon defendant to show that the injury to said stock was not caused by defendant's negligence in handling said car." This placed the burden on the wrong party. At common law the carrier was an insurer of the safe delivery of freight unless it was prevented by the act of God or the public enemy and therefore proof of delivery to the carrier in good condition and nondelivery at destination; or if it was delivered, proof that it was damaged, made a prima-facie case for the plaintiff, and cast the *onus on the carrier* to exculpate himself by showing an act of God or the public enemy. But there was a class of freight which, in course of transportation could become wasted or lost from its inherent nature, as, for instance, by evaporation; or by decay and the like, and common sense and justice suggested that a carrier did not insure the shipper against that kind of loss; and so, in that class of cases, a third exception was added to the carrier's liability. Then in the course of time and the development of conditions, the duty devolved upon the carrier to transport live animals. This was a business said, by some writers, not to have existed in the early days when the common law had its origin. But, whenever it did have its origin and it became a duty and a business, there came with it the further exception to the carrier's obligation closely resembling the one just mentioned; that is, there was no insurance again loss occasioned by the inherent propensities of the animals carried. [Georgia Railroad v.

Spears, 66 Geo. 485; Evans v. Fitchburg R. R. Co., 111 Mass. 142; McCoy v. K. & D. M. R. Co., 44 Iowa, 424; L. N. O. & T. Ry. v. Bigger, 66 Miss. 319.]

While it has nothing to do with the question or the decision which we are coming to, yet, in view of the authorities (speaking for the writer only), we may admit, without casting doubt on our decision, that, with an exception we shall presently mention, the burden of showing how, or why, the loss or damage to live animals occurred, remained with the carrier the same as in inanimate freight. [Railway Co. v. Wynn, 88 Tenn. 320; Swiney v. Express Co., 144 Iowa, 342; T. W. & W. R. Co. v. Hamilton, 76 Ill. 393; Dow v. Steam Packet Co., 84 Maine, 490; St. L. Southwestern Ry. Co. v. Kilberry, 83 Ark. 87; Hinkle v. Ry. Co., 129 N. C. 932; Chicago Ry. Co. v. Woodward, 164 Ind. 360; Lindsay v. Chicago, M. & N. P. Ry. Co., 36 Minn. 539; Stiles v. Ry. Co., 129 Ky. 175.] There are decisions of our Courts of Appeals that at first sight might be said to be opposed to this statement (Winslow v. Railroad, 170 Mo. App. 617; Cunningham v. Ry. Co., 167 Mo. App. 273, and perhaps others) but in each of these there was an agreement by the shipper that he would accompany and care for the stock; and hence, as we will now proceed to show, they properly stated the law in saying that the burden was on the shipper.

In the present case the contract of shipment provided that the shipper or his agent, should have free passage and should accompany the stock to take care of it, and that fact forms the exception of which we have just spoken. The chief reason for casting the burden of proof upon the carrier is that, ordinarily, freight is delivered over to him exclusively and the shipper cannot well know anything of it, or the cause of anything which may happen to it. Such information is peculiarly within the knowledge of the carrier and hence he is required to produce the proof of whatever will excuse him. But the court is of the opinion that

this reason fails, in the shipment of live animals, if the shipper accompanies them; hence the burden is on him to prove that the loss was occasioned by the carrier's negligence. [Clark v. St. L., K. C. & Northwestern Ry. Co., 64 Mo. 440, 448; McBeath v. W. St. L. & P. Ry. Co., 20 Mo. App. 445; Terre Haute & L. R. Co. v. Sherwood, 132 Ind. 129; Louisville Ry. Co. v. Hedger, 9 Bush. 645; Penn. R. Co. v. Raiordon, 119 Pa. St. 577, 584; Norfolk Ry. Co. v. Reeves, 97 Va. 284, 290; St. L., I M. & So. Ry. Co. v. Weakly, 50 Ark. 397, 415.] Standard text books state the same rule. [4 Elliott on Railroads, sec. 1549; 3 Hutchison on Carriers, sec. 1357; 5 Am. & Eng. Ency. of Law (2 Ed.), 446, 439, 453.] But in the circumstances of the record we think the jury could not have been misled and consequently no harm was done. The part of the instruction preceding that to which we have referred required the jury to find that the animals were properly loaded at Glasgow in a car furnished by defendant and that the car was accepted and sealed by defendant and that afterwards, before leaving Glasgow, while placing the car in the train, ran it into and against other cars with such usual violence and speed as to throw down and greatly injure the animals. Instruction number 6 for plaintiff also required the jury to find that the defendant negligently injured the animals by the act of its employees and servants. Again instruction number 1 for defendant put the burden of proof on the plaintiff and number 2 stated the hypothesis that if the injury happened to the animals by reason of neglect of plaintiff's servant accompanying them, there could be no recovery. And at no place did defendant ask an instruction explanatory of the difference in burden of proof when the action is based on a shipment of animals accompanied by the owner. We do not say a litigant is compelled to ask an instruction to cure error in those of his opponent; but we are satisfied that in the state of the record before us no misunderstanding could

have been had by the jury on account of the unfortunate wording of that part of the instruction quoted.

It is conceded that plaintiff's instruction on the measure of damages was correct and hence we think there is nothing substantial in defendant's objection to evidence as to what two or more of the animals were worth per day for work.

We have not discovered any error justifying a disturbance of the judgment and it is consequently affirmed. All concur.