W. H. MULLIS, Respondent, v. GUY A. THOMPSON, Trustee for the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant. —No. 40513.—213 S. W. (2d) 941.

Division One, September 13, 1948.

Rehearing Denied, October 11, 1948.

*Thomas J. Cole, Ludwick Graves,* and *Jacob Brown* for appellant.

*Gayles R. Pine* and *Ike Skelton* for respondent.

[942] VAN OSDOL, C.—Action for injuries to person and to property. A jury returned a verdict awarding [943] damages in the aggregate sum of $18,800. Defendant has appealed from the ensuing judgment.

Defendant's train, an engine and five coaches, coming from the west, struck plaintiff's 1936 Chevrolet 1½-ton truck at the Holden Street crossing at Warrensburg.

Plaintiff had pleaded primary negligence and negligence under the humanitarian rule but his case was submitted to the jury only on issues of primary negligence, (1) in failing to sound a whistle or ring a bell, warning of the train's approach; and (2) in moving the train at a speed in violation of a city ordinance. Defendant had tendered the general issue and pleaded, and the trial court submitted contributory negligence of plaintiff in failing to stop, look and listen; in failing to stop his truck after he saw or should have seen the approaching train and while he was yet in a place of safety; in failing to keep the truck under control; in failing to listen where to listen was to hear, and to heed the sound and signals of the approaching train; and in failing to heed "flasher" warning signals at the crossing.

It is contended by defendant-appellant that plaintiff was contributorily negligent as a matter of law; and that Instruction No. 2, given at plaintiff's instance, submitting the issue of speed in excess of that limited by ordinance, and Instruction No. 1, submitting the issue of negligence in failing to sound a warning, were erroneous.

At about 7:00 o'clock in the clear, dry morning of March 7, 1946, plaintiff (respondent herein), a contractor, 63 years old, driving his truck northwardly on Holden Street in Warrensburg, approached defendant's tracks which cross Holden Street at right angles and lie in an east-west direction.

Defendant's main line is straight for several hundred feet east and west of the crossing. In crossing the tracks from the south at the Holden Street crossing, the traveler on the street passes over defendant's five tracks in the following order—the stock track, the house track, the main track or line, the main passing or siding track, and the north siding track. It is 78½ feet from the south rail of the stock track to the south rail of the main line. Holden Street, where it passes east of the depot, is 46 feet wide; and the west curb of the street is 24 feet from the east end of the depot. The depot is 26 feet wide (north and south). It is 17 feet 8 inches from the front of the depot to the south rail of the main line. A "bay window" extends three or four feet to the northward from the main structure of the

depot. The east side of the bay window is about eighteen feet west of the east end of the building.

A city ordinance, in full force and effect on March 7, 1946, provided no train shall be operated within the "city limits of the City of Warrensburg at a greater speed than 35 miles per hour."

Flasher signal standards are set on both sides of Holden Street. The standards are set 16 feet south of the south rail of defendant's main line. And there are flasher signal standards on both sides of Holden Street north of defendant's north siding track. The southeast standard bears two red flasher or blinker lights which may be alternatingly illuminated or "flashed" by the movement of trains within the signal circuit which begins 1750 to 1800 feet west of the Holden Street crossing and ends about 10 feet east of that crossing. The word "STOP" is also displayed on the standard. The word is illuminated throughout the time a train is within the signal circuit.

In moving northwardly approaching the crossing, the street traveler moves down a decline; "you come down to the first tracks there and then you level off until you get across the rest of the tracks and then you start up an incline again."

Plaintiff was familiar with the crossing—had been "across this Holden Street crossing many times." He testified he moved down the incline in approaching the crossing (from the south) at a speed between ten and fifteen miles per hour. The left window of the cab of his truck was lowered. When he came to a point twenty or twenty-five feet from the main track, he "slowed up and stopped—practically [944] stopped." At this point plaintiff had but a limited view to the westward. But there was evidence tending to prove that had plaintiff moved on to a point sixteen feet from the main line he could have seen 675 feet down the main-line track. Plaintiff, having "practically stopped," looked both ways and saw no train and heard no train. He did not hear a whistle or a bell. He looked at the "signal lights." The signal lights "were not in operation." There "wasn't any light and there was another car (driven by one Herbert Smith) went around me and crossed and then I started across . . . picked up speed." He does not remember what happened after he "picked up speed." He testified he believed he did not look to his left or to his right after he "started across." The front of the left side of his truck was struck by the right side of the pilot of defendant's freight engine (Class 1400) pulling a "troop train" of five passenger coaches, which train had approached from the west. The truck was "thrown southeast." Plaintiff was thrown clear of the truck wreckage, and several feet further to the eastward. Witnesses for plaintiff testified the train was moving at a speed variously estimated within the range of from 45 to 55 miles per hour. Defendant's witnesses estimated the train's speed at 30 to 35 miles per hour.

Photographs disclose "skid marks" made by the tires of plaintiff's truck. The marks are first discernible at a point about 15 feet from the south rail of the main line. The marks run due north for 8 or 10 feet and then abruptly veer to the right and approach to within about 2 feet of the planking south of the south rail at a 45° angle, thence the marks curve more to the right, becoming almost parallel with and disappearing along the planking south of the rail.

The automobile driver, Herbert Smith, who passed plaintiff just south of the crossing, testified the flasher signals were not flashing, and, although in a position to hear, he testified he heard no bell or whistle. He testified he was moving "around 20 or 25 miles per hour" and passed plaintiff "practically right on the tracks furtherest south of the depot."

Several of defendant's witnesses testified positively the engine's bell was ringing and the whistle blowing; however, defendant herein upon appeal does not contend plaintiff did not make out a submissible case on the issue of primary negligence in failing to sound a warning.

■ Examining the contention the evidence shows plaintiff to have been guilty of contributory negligence as a matter of law—it is true plaintiff could have moved closer (than twenty or twenty-five feet) to the main track and to a point where he would have had a "sight distance" of several hundred feet down the track to the westward. In approaching the main-line track to a point twenty or twenty-five feet therefrom, plaintiff had a view of but limited extent (we cannot determine from the record the extent of his view) down to the westward and, in looking, saw no train. The flasher signal device was there present southeast of the crossing and in part demanding and engaging the plaintiff's attention. It is not to be said that one in approaching a crossing in the exercise of due care (the highest degree of care in our case) should rely solely upon a signal device—he should use his own senses—yet the flasher signal device, if unlit, was implicit assurance that the crossing could be made in safety. Gorman v. St. Louis Merchants' Bridge Terminal R. Co., 325 Mo. 326, 28 S. W. 2d 1023; Perkins v. Kansas City Southern R. Co., 329 Mo. 1190, 49 S. W. 2d 103; Rhineberger v. Thompson, 356 Mo. 520, 202 S. W. 2d 64; Sisk v. Chicago, B. & Q. R. Co., Mo. App., 67 S. W. 2d 830. See also Monroe v. Chicago & A. R. Co., 280 Mo. 483, 219 S. W. 68.

When approaching a railroad crossing, the railroad track itself is a warning of danger, and, if the highway traveler's view is obstructed and he is unable to see whether he can pass across in safety, he should take precautions commensurate with the circumstances. He should stop, if necessary, and look and listen where looking and listening are effective. And, if the view is obstructed, he should give more attention to sound, and approach the crossing at such speed

that he can stop after passing obstructions and before entering [945] within the zone of danger. State ex rel. Kurn v. Hughes, 348 Mo. 177, 153 S. W. 2d 46, and cases therein cited; Rhineberger v. Thompson, supra.

In the case at bar the presence of the "flasher" warning device is a circumstance to take into account in examining the question of plaintiff's contributory negligence. It was plaintiff's duty to look for such "flasher" warnings as might be shown by the device installed by defendant to warn of the passing trains. Poague v. Kurn, 346 Mo. 153, 140 S. W. 2d 13; Perkins v. Kansas City Southern R. Co., supra. Where to look is to see and a plaintiff, having a duty to look, says he did not see, it is presumed he failed to look or looked so carelessly or inefficiently as to amount to not looking at all. Poague v. Kurn, supra; State ex rel. Kansas City Southern R. Co. v. Shain, 340 Mo. 1195, 105 S. W. 2d 915; Dempsey v. Horton, 337 Mo. 379, 84 S. W. 2d 621. And so in the case of Poague v. Kurn, supra, cited and relied on by defendant, in considering the trial court's refusal to submit charges of primary negligence, this court held the trial court had correctly ruled a plaintiff's conduct was contributorily negligent as a matter of law. The plaintiff in that case testified he had stopped 10 or 15 feet from a passing track which was 12 or 14 feet from the main line on which defendant's passenger train was approaching from the south. He saw no train on the tracks coming from the south. His own witnesses testified (and plaintiff upon appeal admitted in his brief) that defendant's automatic alarm-bell, wig-wag warning device was working. He was looking to see if a train was approaching from the north. He drove on and to the crossing *"in the face of the ringing alarm bell and the swinging wig-wag,"* and without looking south until the front wheels of his car were on the main-line track. Failure to see what was plainly visible (according to plaintiff's own witnesses) before his eyes, and to hear what others heard (or to heed it if he did) was conclusive evidence of contributory negligence.

In the instant case, while the evidence was in conflict, there was substantial evidence tending to show that the "flasher" warning device was not working. The plaintiff so testified, and so did the witness Smith. Another witness, Silvers, testified he, approaching the crossing from the north, was a little more than 100 feet from the crossing when he saw three cars of defendant's train pass over the crossing. "Before the train went by the signal lights were not burning." There "was no signal that any train was coming." After the train had gone by, the witness saw there had been a collision. The witness tried to safely park his heavy truck by driving it into the west curb, "jumped out of it and ran over there to help" plaintiff. The witness's truck "broke loose and broke down the (flasher) standard" northwest of the crossing. After the train had

passed beyond the signal circuit the lights on the southeast standard were burning. This circumstance, it was explained by a witness for defendant, could have been due to the fact that as the "wreckage (of the truck) passed it scraped one of those (signal) instrument cases" situate southeast of the crossing. True, defendant produced four witnesses, two of whom were in an automobile directly behind plaintiff's truck as he moved up to the point of the collision, who testified the lights of the southeast warning device were flashing. Defendant argues the credible evidence was all one way, was overwhelming and conclusively demonstrated the "flasher" signals were working, but we do not invade the province of the triers of fact by determining the credibility of the witnesses and the weight and value of their testimony.

Considering the evidence from a standpoint favorable to plaintiff, we think it could not be soundly urged there was no substantial evidence tending to prove the following facts—the train was moving at a rate of speed of 45 to 55 miles per hour, and at a speed in excess of the speed to be expected in view of the provisions of the city ordinance. No whistle was sounded and no bell was ringing. Plaintiff, having slowed down his speed to about five miles per hour, approached to a point 20 to 25 feet from the main-line track and "looked both ways." He saw and heard no train or whistle or bell. He then looked at the [946] "flasher" device which displayed no lights or warning flashes. Another automobile had passed him and had proceeded on across the crossing. Although he there had not had a complete view westward down the main line he, without again looking, proceeded on and upon the main line and was struck by the train and injured. In our opinion the question whether plaintiff was contributorily negligent in the circumstances was for the jury.

Defendant contends Instruction No. 2 [submitting the issue of negligence in traveling at a rate of speed in excess of the speed (35 miles per hour) as fixed by city ordinance] is erroneous, in that it is confusing in using the clause "if you further find from the evidence that such negligence directly contributed to plaintiff's injuries, and was the proximate cause thereof." The term "directly contributed" could be said to be no more than the requirement of a finding that speed was a contributing or concurring cause of plaintiff's injury. It is borne in mind defendant's negligence in failing to sound a crossing warning by whistle or bell was submitted in Instruction No. 1; and it is to be noted the Instruction No. 2 further requires the finding the negligence in moving at the unlawful speed was the proximate cause of plaintiff's injuries. It is urged by defendant there is not one iota of evidence in the record which either directly shows any causal connection between the alleged violation of the speed ordinance and the happening of the collision, or from which such causal connection can be logically inferred. And defendant says it

is, moreover, demonstrable the speed of 50 miles per hour could not have been the cause or a cause of the injury. As we understand it, this argument presents only the question of causal connection between the speed (in excess of the ordinance) and the injury. Could it be reasonably found the speed in excess of that prescribed by ordinance was a cause but for which the plaintiff would not have been injured?

It is said by defendant that, traveling at the rate of 5 miles per hour, plaintiff was covering 7.33 feet per second and at that speed would cover the distance of from 20 to 25 feet up to the first or south rail of the main line in approximately 3 seconds. If the train were going 50 miles per hour as contended by plaintiff's witnesses, it was then traveling 73 feet per second, and when plaintiff was between 20 and 25 feet south of the main track, the train traveling at 50 miles per hour was then approximately 219 feet west of the point of collision. If the train were traveling 35 miles per hour as asserted by defendant, it would then have been moving 51.33 feet per second and would have negotiated the distance of 219 feet in 4 instead of 3 seconds, as would be the case at 50 miles per hour speed, during all of which time plaintiff was traveling the last 20 or 25 feet up to the main track. "In other words (defendant says), an additional second would have been afforded to plaintiff, but the only difference this additional second could have made would have been to bring about a collision in which the train would have struck plaintiff's truck broadside instead of at the left front portion thereof, and would thus have probably snuffed out plaintiff's life."

But we say it was the defendant's duty to reduce the train's speed to not more than 35 miles per hour when the train approached the west line of "the city limits of the City of Warrensburg" which "city limits," we infer, were more than 600 feet west of the Holden Street crossing; that defendant owed such duty to defendant's employees and passengers, and to plaintiff and others traveling on the city streets as a class; that the duty, by the ordinance imposed, contemplated the protection of persons in such circumstances as obtained when the train approached and passed through the city and over the various crossings. Defendant's responsibility should not be limited to its failure to perform its duty only in a segment of the distance between the city limits and the point of the collision, if the failure (to perform the duty to move not more than 35 miles per hour all through the city) were yet a proximate cause of plaintiff's injury. Now, defendant's argument would assume that plaintiff's truck was moving and would continue to move directly north. Defendant [947] does not comment on the significance of skid tracks which veer to the eastward, except to say that such tracks strongly suggest that plaintiff, in moving toward the crossing, actually did see the train when he was within fifteen to twenty feet south of the main line and "for

some unexplained reason permitted his truck to get out of control.''
Plaintiff testified he did not remember what occurred after he ''started
across'' the crossing. If it can be said he did look westward and saw
the train, then it could be also argued the ''skid marks'' indicate
he put on the truck brakes and swerved to the right, endeavoring to
pass to his right and south of the main-line tracks. If so, we could
not with reasonable certainty say he would not have escaped injury
had the train been moving in obedience to the ordinance. As we
have seen supra, there was substantial evidence tending to show
defendant's train was traveling between 45 and 55 miles per hour.
Had the train been moving but 35 miles per hour throughout the
city limits it would be not unreasonable to say plaintiff could have
and, no doubt, would have passed on over the crossing.

In the case of Rigley v. Pryor, 290 Mo. 10, 233 S. W. 828, there
was shown there was a custom for defendant's trains to travel at a
speed of ten or twelve miles per hour when moving through fogs. The
evidence showed the train was moving twenty-five miles per hour,
through a fog which was usual along the Missouri River at that time
of year. The train, having moved eastwardly through the fog at a
speed of twenty-five miles per hour and in disregard of the custom,
struck a handcar on which plaintiff, defendant's employee, was riding,
inflicting injuries upon him. One act of negligence alleged was that
of excessive speed. The defendant-appellant claimed the speed of
twenty-five miles per hour was not the proximate cause of the col-
lision, because it was not shown that the collision could have been
avoided if the train had been running at a lower rate of speed. This
court considered it pure assumption to say that a train running at
half the speed would have caused the same injury or one like it. If
the train had been running at half the speed from the time it crossed
the river (over four miles to the westward), the handcar would have
been to its destination (near the Milwaukee Bridge, one mile and a
quarter west of the place of collision) and off the track. If not, the
men on the handcar would have had double the time in which to jump
for their lives after they saw the train appearing in the fog; the
force of the collision, if there had been one, would necessarily have
been much less. It was held to be a question for the jury as to whether
an excessive rate of speed was the cause of the injury.

In our case, we believe, it was a jury question whether moving
at a speed in excess of 35 miles per hour was a cause of plaintiff's
injuries.

By the Instruction No. 1, given at plaintiff's instance, the jury
were instructed, in part,

''The Court instructs the jury that under the law the defendant
was required to place on each locomotive engine a bell to be rung at
a distance of at least 80 rods from the place where the railroad shall

cross any traveled public street and that said bell be kept ringing until it shall have crossed said street, *or* a steam whistle shall be attached to such engine and be sounded at least 80 rods from the place where the railroad shall cross any such street and be sounded at intervals until it shall have crossed such street." (Our italics.)

The instruction continued, "that if you find from the evidence . . . defendant's agents, servants and employees ran and operated a railroad train easterly through the City of Warrensburg, and if you further find that the bell on said engine was not ringing at a distance of at least 80 rods west from Holden Street crossing and kept ringing until said engine crossed the Holden Street crossing, *and* if you find from the evidence that the whistle on said engine was not sounded at a distance of at least 80 rods west from said crossing and sounded at intervals thereafter until said engine had crossed the Holden Street crossing then you are instructed that the failure to ring the bell *and* sound the whistle as aforesaid, if you [948] so find, from the evidence that there was such failure to ring the bell, *or* sound the whistle on said train, would constitute negligence . . ." (Our italics.)

After a careful study, we believe we cannot agree with defendant's contention that the instruction "imposes a duty on the railroad to both ring the bell and sound the whistle for the crossing." The instruction is not like the Instruction No. 3 held to be erroneous in the case of Wolfe v. Hines, Mo. App., 224 S. W. 143, but was, in effect, more like the Instruction No. 1 which in that case was conceded by the appellant as requiring the "finding of both failures." The instruction in the instant case first advised the jury the law required defendant to ring a bell *or* sound a whistle. The instruction then hypothesized the negative of defendant's stated duty—that is, defendant's failure to ring the bell *and* sound the whistle. The instruction further told the jury that the failure to ring the bell *and* sound the whistle *as aforesaid,* if the jury found from the evidence there was such failure to ring the bell *or* sound the whistle, was negligence. In the instant case plaintiff had pleaded and assumed the burden of showing defendant neither rang the bell nor sounded the whistle. Defendant introduced testimony tending to show the whistle was sounded and the bell ringing. See Section 5213 R. S. 1939, Mo. R. S. A. Sec. 5213, excepting the sounding of whistles in cities; and Moyer v. Chicago & A. R. Co., Mo. Sup., 198 S. W. 839. See also the case of McGraw v. Montgomery et al., Mo. App., 185 S. W. 2d 309, wherein an attack was made on a like instruction (No. 4 in that case) which defendants-appellants in the case contended imposed an unauthorized burden on defendants.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur except *Conkling, J.,* doubtful.