### COLLEY et al. v. COX.

No. 7235.

Springfield Court of Appeals.

Missouri.

March 24, 1954.

STONE, Judge.

In this action for alleged breach of defendant's common-law duty as a common carrier, plaintiffs seek damages for injuries to forty-six head of white-faced cows transported by defendant from the O'Bryan Ranch near Hiattville, Kansas, to plaintiffs' farm near Jerico Springs, Cedar County, Missouri, a distance of seventy to seventy-five miles. Defendant appeals from an adverse judgment of $5,000.

Since the principal contention of defendant-appellant (hereinafter called defendant) upon appeal is that the trial court should have directed a verdict for defendant, a review of the evidence is necessary. Of course, it is axiomatic that, at this state of the litigation, the evidence must be considered in the light most favorable to plaintiffs-respondents (hereinafter called plaintiffs), according to plaintiffs the benefit of all favorable inferences arising from the evidence and disregarding defendant's evidence except insofar as it aids plaintiffs' case. Smith v. Siedhoff, Mo.Sup., 209 S.W. 2d 233, 234(1); Williamson v. St. Louis Public Service Co., 363 Mo. 508, 512–513, 252 S.W.2d 295, 297(1); Sollenberger v. Kansas City Public Service Co., 356 Mo. 454, 462, 202 S.W.2d 25, 29(2).

Plaintiff, Ben Colley, is a farmer and has been engaged in the cattle business "practically all of my life". Plaintiff, Garland Colley, is the son of Ben Colley, has been on a farm "all my life", and in partnership with his father has dealt in livestock since 1946. On October 25, 1951, plaintiffs accompanied by Virge Duvall, a neighbor, and D. O. Wiles, a livestock commission man at the Joplin Stock Yards, drove to the ranch of Joe O'Bryan near Hiattville, Kansas. O'Bryan is a farmer and stockman, who handles several thousand head of cattle at his ranch each year. At this particular time, he had a herd of fifty-four head of white-faced cows in a pasture some twelve or fifteen miles northeast of his home. These cattle had been shipped by train from Texas to the O'Bryan ranch several weeks prior to October 25, 1951, had been unload-

Roy Coyne, Max A. Patten, Joplin, for defendant-appellant.

Stemmons & Stemmons, Mount Vernon, Joe W. Collins, Stockton, for plaintiffs-respondents.

ed from a spur track into a pasture on the O'Bryan ranch, and were the only cattle in that pasture when plaintiffs went there.

They were described by witness O'Bryan as "a choice set of stock * * * Hereford cows", bearing the brand "SMS" which "is recognized in cattle"—"the best we know of". They were stock cows, not milk cows, and were handled on horseback. O'Bryan stated that he had no trouble with these cows during the time he owned them; that they were "not wild * * * not mean cattle in any way, shape or form"; that the herd was calm; and, that they were "easy and nice cattle to handle".

O'Bryan was not with plaintiffs when they inspected this herd. Plaintiffs testified that they and neighbor Duvall alighted from their automobile (Wiles remained in the automobile because he had been sick); that they "walked around among the cattle"; that they were "a good bunch of cattle"; that "there wasn't any sick or we wouldn't of bought them"; that the cattle were "in good condition", none of them were sick, wild or vicious, and none of them had "any scars or bruises or banged-up places on them"; that, after inspecting these cattle in the pasture for about thirty minutes, looking at them "as closely as we cared to—we was right up next to them", plaintiffs decided to buy them; and that, on the same day, they purchased the fifty-four head for $13,500.

Plaintiffs, accompanied by Duvall and Wiles, then returned to the Joplin Stock Yards where arrangements were made for defendant to transport forty-six head of these cattle in two trailers from the O'Bryan ranch to the Colley farm on the following Saturday, October 27, 1951. The remaining eight head were to be hauled by Garland Colley in his "bobtail" truck. Although disputed by defendant, Garland Colley testified that he and his father told defendant that these cattle were to be hauled to the Colley farm two miles east of Jerico Springs, Missouri.

When young Colley went to the Joplin Stock Yards about 8:00 A.M. on Saturday, October 27th, defendant informed him that the trucks had made a trip to Kansas City, but "that they would be out to the (O'Bryan) ranch when I got there probably". Colley proceeded to the O'Bryan ranch where, as he said, defendant's trucks did not arrive until 3:00 to 4:00 P.M. Witness Mayhue, defendant's employee who drove one of them, thought that the trucks arrived at the O'Bryan ranch between 10:00 and 11:00 A.M. One of the two tractor-trailer units sent by defendant to the O'Bryan ranch was owned and furnished by D. C. Rook, who also operated out of the Joplin Stock Yards as a common carrier. However, the engagement to transport plaintiffs' cattle was that of defendant, not of Rook; and, it is conceded that defendant's obligations with respect to such transportation were those of a common carrier.

Garland Colley testified that, while waiting some five or six hours for the tractor-trailer units to arrive at the O'Bryan ranch on October 27th, he was "around the cattle during all of that time"; that they were in "excellent condition"; and, that none of them were sick, scarred or bruised. Jay Fry, an employee on the O'Bryan ranch for fifteen years, had "known" this particular herd for some two or three weeks and had fed them every day. He assisted in loading them on October 27th, stated that they were "in good shape", and confirmed young Colley's testimony that none of the cattle were scarred, bruised or "banged up". "They were a gentle bunch" and "they loaded easy and nice".

William Westoff, who sold cattle for O'Bryan and had been in the cattle business "off and on all my life", had been "acquainted" with that herd of cattle for about six weeks; and, although he did not recall having seen them on October 27th, he had seen them the previous day and, in fact, practically every day they had been on the O'Bryan ranch. He described them as "choice white-face stock cows" and said that, on the day prior to their shipment, the herd "was in perfect condition". He likewise expressed the opinion that these cattle were calm and quiet and had no vicious propensities.

The only affirmative defense pleaded in defendant's amended answer was that "any injury suffered by (plaintiffs) in shipment of said cattle was all due to the carelessness and negligence of the plaintiff when he failed to instruct the drivers where to deliver said cattle and the failure of (Garland Colley) to meet the drivers at the highway point near Fort Scott which was designated by the plaintiff as the point of rendezvous". In support of this affirmative defense, driver Mayhue testified that, after twenty-three cows had been loaded into each of the two large trailers and the remaining eight cows had been loaded into Colley's "bobtail", Garland Colley "mentioned the 69 Cafe in Fort Scott right on the highway" and "that we would meet there and eat", and that Colley told him "we are going to Jerico Springs—I will lead the way and show you where to take them". Mayhue also said that he and Wilson, the other driver, waited at the "69 Cafe" in Fort Scott for young Colley until 6:30 to 7:00 P.M. According to Mayhue, he did not know where the cattle were to be taken other than that they were to be delivered "somewhere in the vicinity of Jerico".

However, young Colley insisted that, while loading the cattle at the O'Bryan ranch, drivers Mayhue and Wilson "asked me where the cattle would be delivered and I told them it would be two miles East of Jerico Springs at our farm there". Colley denied having said anything to defendant's drivers about meeting them at the "69 Cafe" in Fort Scott or elsewhere. He said that the two tractor-trailer units left the O'Bryan ranch about fifteen minutes before he did and that, as he proceeded to Jerico Springs, he assumed that they were ahead of him.

While the cattle were being loaded at the O'Bryan ranch, the tractor owned by Rook and driven by Wilson "developed a little knock"; and, when the two tractor-trailer units stopped at the "69 Cafe" in Fort Scott, driver Mayhue "called Mr. Rook and told him that he (Wilson) had a knock in his tractor and to send one right out". In response to Mayhue's call, Rook dispatched a replacement tractor driven by Rex Sul-

lins, who arrived at Fort Scott about 5:15 P.M. The tractor in charge of driver Wilson was detached, the replacement tractor driven by Sullins was hooked to the trailer, and Wilson "dead-headed" to Joplin with the tractor which had developed "a knock". Between 6:30 and 7:00 P.M., drivers Mayhue and Sullins started from Fort Scott toward Jerico Springs. "We decided maybe he (Garland Colley) was waiting for us down the road". However, drivers Mayhue and Sullins did not reach Jerico Springs that night, but about 11:00 P.M. they stopped on the highway six or eight miles West of Jerico Springs near a stock corral. Both drivers testified that they looked at the cows in the trailers before going to sleep in their trucks that night; that "when we parked they was all standing up and all right"; but that (in Mayhue's words) "when we got up at daylight they was all down".

In the meantime, young Colley had reached Jerico Springs about 8:00 P.M. Saturday evening, had called his wife and mother-in-law who had come from Stockton to Jerico Springs and "waited for the trailers while I went to unload my cattle", had returned to Jerico Springs himself and waited there until about 11:00 P.M., and then had gone to Stockton for the night. About 7:30 A.M. on Sunday, October 28th, young Colley located the two tractor-trailer units where they had stopped the previous evening six or eight miles west of Jerico Springs. Mayhue's trailer, which had been unloaded into the nearby corral that morning, was reloaded (except for one cow left at the corral, which later died), and Garland Colley directed the two tractor-trailer units to the Colley farm, where both trailers were unloaded in the road.

Ben Colley, who came to the Colley farm about 10:00 A.M. after one of the trailers had been unloaded and before the other had arrived, gave this description of what he observed and of what occurred at that time: " * * * four or five cattle was down that they dragged out of the truck. As I come by the side of the truck I looked in * * * and there was several down in there. There wasn't nobody around only

this driver and he was setting in the truck. I said, 'What's going on here anyhow?' He said, 'Oh, this is the darnest mess I ever seen.'" After the second trailer was unloaded, Ben Colley found that, of the forty-six cows transported in the two trailers, two were dead and seven were down. At Colley's insistence, five cows, including the two dead ones, were taken to the Joplin Stock Yards by drivers Mayhue and Sullins. Of the three cows still alive when taken to Joplin, two died and one recovered. Ben Colley further testified that "at least twenty-five" of the other cows hauled by defendant were "bunged up and bruised"; that "at least six" of those twenty-five cows had broken bones; that "one's eyes was out and two or three more was gouged up and had some bones sticking out of their backs"; and, that "there was twenty head of them died".

Garland Colley thought that seven cows were hauled to Joplin by defendant's drivers, of whom two were dead already, four died later, and one recovered. He testified that twenty or twenty-five of the other cows transported by defendant "were scarred and bruised" and that "out of this whole transaction" twenty head died. He confirmed his father's testimony that some of the cattle had broken ribs and broken bones when unloaded at the Colley farm. Witness Chism, in front of whose home the trailers were unloaded, said "there was eight down in this (the first) truck and we had taken four out that couldn't stand up— there was four sent back to Joplin". Chism was not present when the second trailer arrived. Witness Pullen, who operated a country store near Jerico Springs, said that he had purchased five dead cows from Ben Colley during the latter part of October, 1951, to be used for hog feed; that he sent three of those cows "to the plant" without skinning them; but that, of the two cows skinned by him, "one * * * had some broken ribs and the other one was bruised all over".

■■ At common law, it is the duty of a carrier "to bring a shipment safely through at all hazards, save the act of God, the public enemy, or the inherent nature of the freight", Morrow v. Wabash R. Co., 219 Mo.App. 62, 265 S.W. 851, 855(9); and, "in the absence of a special contract, the liability of the carrier is the same with respect to livestock as to inanimate freight, with certain additional exceptions", namely, "that the carrier is not liable if its failure to properly and safely deliver in good condition was due to the act of God, the public enemy, the inherent vice or nature of the animal or its vicious propensities, or the fault of the shipper," Jones v. St. Louis-San Francisco R. Co., 226 Mo.App. 1152, 50 S.W.2d 217, 220; Sullivan v. American Ry. Exp. Co., 211 Mo.App. 123, 245 S.W. 375, 376(2); Kolkmeyer v. Chicago & A. R. Co., 192 Mo.App. 188, 182 S.W. 794, 797.

■ Where, as here, plaintiffs do not plead negligence but sue for alleged breach of the carrier's duty at common law, proof of delivery to the carrier in good condition and of receipt from the carrier in bad condition makes a prima facie case for plaintiffs, Vaughn v. Wabash R. Co., 239 Mo. App. 340, 188 S.W.2d 352, 353(2); Griggs v. St. Louis & H. R. Co., Mo.App., 285 S. W. 159, 160(2); Cudahy Packing Co. v. Atchison, T. & S. F. R. Co., 193 Mo.App. 572, 187 S.W. 149, 152(5), which casts the burden on the carrier to show that the injury or loss is caused by inherent infirmities or vicious propensities of the animals or by the fault of the shipper. Morrow & France v. Wabash R. Co., 220 Mo.App. 518, 521-2, 276 S.W. 1030, 1032; Hartford Fire Ins. Co. v. Payne, Mo.App., 243 S.W. 357, 359(1), certiorari quashed 298 Mo. 418, 250 S.W. 393.

■■ Of course, if negligence is pleaded, the shipper must prove the negligence charged against the carrier and the submission must follow the case as pleaded. Walton v. A. B. C. Fireproof Warehouse Co., 233 Mo.App. 693, 124 S.W.2d 584, 587-8(1, 2); Sullivan v. American Ry. Exp. Co., supra, 245 S.W. loc. cit. 377(5). However, even where the shipper pleads and seeks to recover for negligence on the part of the carrier, it is "only necessary that sufficient circumstances be shown to raise

a slight inference of negligence on the part of defendant", Shaffer v. American Ry. Exp. Co., Mo.App., 282 S.W. 725, 728, and "very slight proof of negligence will suffice to lay the burden of exculpation from fault upon the carrier." Cunningham v. Wabash R. Co., 167 Mo.App. 273, 149 S.W. 1151, 1152. "Only slight evidence is sufficient to create an inference that animals were injured by rough handling, rather than by their inherent nature or propensities." Jones v. St. Louis-San Francisco R. Co., supra, 50 S.W.2d loc. cit. 218.

■ That livestock is in good condition when delivered to a carrier but, when delivered to the consignee at the point of destination, is wounded, crippled or maimed, "as by external violence, during transit, and thus evince a physical condition which does not usually appear if the carriage was had with ordinary care", Cunningham v. Wabash R. Co., supra, 149 S.W. loc. cit. 1152, appears to be sufficient to make a prima facie case and to authorize the jury to infer and find negligence on the part of the carrier, irrespective of whether the suit is bottomed on negligence, Shaffer v. American Ry. Exp. Co., supra, 282 S.W. loc. cit. 728; Cunningham v. Wabash R. Co., supra; Moran v. Chicago, B. & Q. R. Co., Mo.App., 255 S.W. 331, 334(7), or upon breach of the carrier's common-law duty. Jones v. St. Louis-San Francisco R. Co., supra, 50 S.W.2d loc. cit. 219; Morrow v. Wabash R. Co., supra, 265 S.W. loc. cit. 853.

■ By application of the foregoing principles to the facts of the instant case, plaintiffs clearly made a prima facie case against defendant, as a common carrier, which cast upon him the burden of showing that the injury or loss was caused by inherent infirmities or vicious propensities of plaintiffs' cows or by plaintiffs' fault. In fact, it is conceded by defendant that the testimony of plaintiffs and their lay witnesses would have been sufficient to make a prima facie case; but, defendant insists that "the court erred in failing to direct a verdict for defendant for the reason that plaintiffs having proved said cattle were diseased at the time of offering them for shipment could no longer rely on having made a prima facie case, and must then prove specific negligence". This contention is predicated upon the testimony of Dr. Clarence Wilbur Baldwin, a veterinarian who appeared as a witness for plaintiffs. Dr. Baldwin testified on direct examination that, when he went to the Colley farm between 10:00 and 11:00 A.M. on Sunday, October 28, 1951, in response to a call from Garland Colley, he saw "some dead cattle and some that was down"; that he "doctored" four cows, who were down, by giving them "sulfa drugs mostly in solution and penicillin" and "strychnine for the heart, one-fourth of a grain"; that the response of the cattle to this medication was "not very good"; and, that he made another trip to the Colley farm the following day to doctor one or two cows.

On cross-examination, Dr. Baldwin stated that, on his second visit to the Colley farm, he "doctored" two of the same four cows he had treated on Sunday, October 28th, the other two having died in the meantime. In response to inquiries by defendant's counsel as to "what was the trouble with them" and as to the purpose of the drugs administered, Dr. Baldwin testified "it seems like they had been out in the weather and had pneumonia and different ailments" and that the sulfa drugs and penicillin administered by him were for pneumonia and the strychnine was for the heart. Dr. Baldwin was asked how long it takes a cow to develop pneumonia, to which he replied "sometimes from seven to fourteen days, but they can take what we call pleurisy in the tissues between the lungs and the heart—that, from three to five days". The veterinarian conceded that, if some of the cows in question had pneumonia on October 28th, they also had pneumonia on October 25th.

On redirect examination, Dr. Baldwin was asked whether "these cattle (were) scarred and bruised", to which he replied "some they was". He also stated that "one of them had a broken leg" and "one of them was bleeding from the nose some". As to "whether these cattle were down and

sick because they were scarred and bruised and had bones broken", he answered "I couldn't say that for sure—those I doctored was scarred but I can't say something I don't know".

It is clear from his testimony that Dr. Baldwin examined and treated only four of the forty-six cows transported by defendant, and that, although the drugs given by him were administered for pneumonia and for the heart, at least some of the cows examined by him had been injured, apparently from external violence, and evinced a physical condition which does not usually attend a carriage with due care. Shaffer v. American Ry. Exp. Co., supra; Moran v. Chicago, B. & Q. R. Co., supra; Morrow v. Wabash R. Co., supra, 265 S.W. loc. cit. 853. Even as to the four cows to whom the veterinarian ministered, his testimony did not negative or foreclose the inference that rough handling or negligence in transportation mingled or concurred with any inherent infirmity of the animals in proximately causing the loss sustained by plaintiffs, in which event defendant would be liable. Morrow v. Wabash R. Co., supra, 265 S.W. loc. cit. 853 (2); Sullivan v. American Ry. Exp. Co., supra, 245 S.W. loc. cit. 378(7). This doctrine has been recognized and applied in at least three Missouri cases in which animals have died, during or. following transportation, either from pneumonia, Vaughn v. St. Louis-San Francisco R. Co., 223 Mo. App. 732, 15 S.W.2d 901, 905(2), 906(14); Moran v. Chicago, B. & Q. R. Co., supra, 255 S.W. loc. cit. 333, or from "congestion of the lungs." Hartford Fire Insurance Co. v. Payne, supra, 243 S.W. loc. cit. 360 (2). In the Moran case, supra, a post mortem examination had shown that a mare had died from "traumatic pneumonia". The court noted, 255 S.W. loc. cit. 333, that "traumatic pneumonia is induced by external injuries and could be caused by an animal while down being trampled upon or kicked by another horse or horses" and that "the injury could have happened from 12 to 24 hours prior to the appearance of the disease". Bragg v. Payne, Mo.App., 235 S.W. 148, upon which defendant relies,

is clearly distinguishable and is not controlling here.

It has been held that testimony of lay witnesses with respect to the apparent health of *human beings* has some evidentiary weight and probative value, even though it may be contrary to expert medical testimony. Belsky v. Metropolitan Life Ins. Co., Mo.App., 124 S.W.2d 508, 513-514; Allen v. American Life & Accident Ins. Co., Mo.App., 119 S.W.2d 450, 452-453; Allen v. American Life & Accident Ins. Co., Mo.App., 83 S.W.2d 192, 193(1-3); Johnson v. Missouri Ins. Co., Mo.App., 46 S.W.2d 959, 961(2); Wollums v. Mutual Ben. Health & Accident Ass'n, 226 Mo.App. 647, 46 S.W.2d 259, 268(22). "The fact that the care of *animals* is generally in the hands of practical men rather than professional men renders it necessary, when considering the admissibility of opinion testimony regarding diseases and the physical conditions or care of animals, to apply a much lower standard of qualification to witnesses giving opinion testimony on such matters than is applied to expert witnesses offering testimony as to the diseases or physical conditions of human beings. Persons who have habitually had the care of horses, cattle, dogs, and other domestic animals may testify as to their soundness or the disease which they have or to the cause of their death * * *." 20 Am.Jur., Evidence, Section 815. In Thompson v. Chicago, R. I. & P. R. Co., 222 Mo.App. 725, 4 S.W.2d 894, loc. cit. 895(3), a livestock salesman was held competent to testify that, from the appearance of cattle, "he was of the opinion that their injuries were caused by rough handling and not by the inherent vicious propensities of the animals." In Cravens v. Hines, Mo.App., 218 S.W. 912, 914, testimony of a stockman of several years' experience "as to the fitness of * * * cattle for shipment" was held to have been admissible. And, in Hartford Fire Ins. Co. v. Thompson, 8 Cir., 175 F.2d 10, 11, plaintiff was permitted to testify that his herd of cattle was "in awful nice shape" about forty-eight hours prior to discovery of many dead cows in the herd, and admission of testimony by "certain witnesses

who had special training and knowledge but were not veterinarians" as to the cause of death of cattle was held to have been proper. See also Woolwine v. Bick, 39 Mo.App. 495, 500; Johnson v. Moffett, 19 Mo.App. 159, 161; Gulf, C. & S. F. R. Co. v. Morris, Tex.Civ.App., 241 S.W. 235, 237(4), affirmed Tex.Com.App., 250 S.W. 1017; Gulf, C. & S. F. R. Co. v. Kimble, 49 Tex.Civ.App. 622, 109 S.W. 234, 236(2); Southern R. Co. v. Proctor, 3 Ala.App. 413, 57 So. 513, 515(7).

██ Thus, the testimony of plaintiffs and lay witnesses in the instant case, who were shown to have had much experience in handling cattle, to the effect that, at the time of their delivery to defendant, plaintiffs' cows were (as Garland Colley said) "in excellent condition" with none of them sick, scarred or bruised or (as witness Fry said) "in good shape" with none of them scarred, bruised or "banged up", and that, on the day prior to shipment, the herd was (as witness Westoff said) "in perfect condition", cannot be said to have been without evidentiary weight and probative value, even if a contrary inference as to the condition of the cows on October 27th might have been drawn from the testimony of Dr. Baldwin.

██ If the testimony of Dr. Baldwin had gone to the condition of all of the forty-six cows transported by defendant, nevertheless the weight and value of his testimony as an expert would have been for the jury, Phares v. Century Electric Co., 336 Mo. 961, 82 S.W.2d 91, 95(11); Spencer v. Quincy, O. & K. C. R. Co., 317 Mo. 492, 297 S.W. 353, 357(11); and, in our view of this case, plaintiffs still would not have been bound conclusively by his testimony in view of other evidence from which we think that the jury reasonably might have found that the cows in question were in good condition when delivered to defendant but were injured when redelivered at the point of destination, and that defendant's negligence mingled or concurred with any inherent infirmity in the cattle to proximately cause plaintiffs' loss. "A plaintiff is not conclusively bound by

all of the most unfavorable testimony of his witnesses 'where there are other facts and circumstances in the case from which the jury may draw a contrary inference.'" Smithers v. Barker, 341 Mo. 1017, 111 S.W. 2d 47, 50(1, 2). "* * * a plaintiff is not bound by the testimony of his own witnesses in so far as such testimony is contradicted by a plaintiff's other evidence. A jury may believe all of the testimony of any witness or none of it, or may accept it in part and reject it in part; just as the jury finds it to be true or false when considered in relation to the other testimony and the facts and circumstances in a case." Burr v. Singh, 362 Mo. 692, 243 S.W.2d 295, 298(4, 5).

██ We are of the opinion that, in any event, the testimony of Dr. Baldwin did no more than create a conflict in the evidence which was for the jury, and not for an appellate court, to resolve. Morrow v. Wabash R. Co., supra, 265 S.W. 851, 853(3); Hartford Fire Ins. Co. v. Payne, supra, 243 S.W. loc. cit. 360(3); Shaffer v. American Ry. Exp. Co., supra, 282 S.W. loc. cit. 728 (2, 3). The trial court did not err in overruling defendant's motions for a directed verdict and in refusing, after trial, to set aside the jury verdict and enter judgment for defendant.

██ The only other point urged on appeal is that "the measure of damage must be supported by the evidence", but this complaint is predicated upon the erroneous statement of counsel that "at no point is there any testimony stating the value of the cattle as a whole at the time they arrived at their destination". On the contrary, we find that both plaintiffs testified, without objection, that the fair and reasonable market value of the forty-six cows transported by defendant would have been $11,500, if they had been delivered at the point of destination uninjured, but that their fair and reasonable market value was $3,500 "in the condition that they were turned over * * * by Paul Cox on that day". There is no complaint that the verdict was excessive or that the jury was not instructed properly on the measure of

damages, i. e., "the difference between the value of the shipment at destination in its damaged state and what its value would have been if uninjured." Jones v. St. Louis-San Francisco R. Co., supra, 50 S.W.2d loc. cit. 221(8); Morrow v. Wabash R. Co., supra, 265 S.W. loc. cit. 854(6); New York, L. E. & W. R. Co. v. Estill, 147 U.S. 591, 616–617, 13 S.Ct. 444, 37 L.Ed. 292, 304.

■ We doubt the competency of certain evidence offered by plaintiffs as to the death of some cows months after their transportation by defendant. However, this testimony was received without objection; and, the jury having been instructed properly on the measure of damages and there having been competent and sufficient testimony to justify and sustain the amount of the verdict, we should not and cannot presume that the jury determined plaintiffs' damages on an improper basis or theory. For that matter, it was not essential to plaintiffs' case that they show what happened to any of the forty-six cows *subsequent* to their delivery at the Colley farm, although "the rule as to the measure of damages permits the plaintiff, up to the time of trial, to show the condition of the injured animal, merely as a means of ascertaining the result of the injury inflicted, so as to better enable the jury to fix the damages at the time and place of delivery." New York, L. E. & W. R. Co. v. Estill, supra, 13 S.Ct. loc. cit. 454, 37 L.Ed. loc. cit. 304.

■ The many conflicts in the testimony were for the jury. We are not at liberty to pass upon the credibility of the witnesses, or the weight and value of their testimony. Mullis v. Thompson, 358 Mo. 230, 213 S.W.2d 941, 945(7). Finding, as we do, that a submissible case was made, the determination of the jury is conclusive on appeal. Smith v. Thompson, 346 Mo. 502, 142 S.W.2d 70, 75(10); Kansas City Stock Yards Co. v. A. Reich & Sons, Mo. Sup., 250 S.W.2d 692, 699(10).

The judgment should be and is affirmed.

McDOWELL, P. J., and BLAIR, J., concur.